F I L E D
**United States Court of Appeals**
**Tenth Circuit**

**APR 5 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

MARTIN MADRIGAL-AGUILAR,

    Defendant-Appellant.

No. 98-2075
(Dist. of New Mexico)
(D. Ct. No. CR-97-606)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO, HOLLOWAY**, and **ANDERSON**, Circuit Judges.

Defendant/appellant Martin Madrigal-Aguilar was an independent trucker, owning and operating his own tractor trailer rig. On September 10, 1997, he picked up a load of fig paste in Fresno, California. The product was to be delivered to the Nabisco Company in Plainfield, New Jersey. On September 12, defendant was driving the truck with the load of fig paste when he arrived at the Border Patrol checkpoint on Interstate Highway 25, just north of Las Cruces, New Mexico. Border Patrol Agent Steve Oldman was on duty when Madrigal entered the checkpoint.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

As Agent Oldman asked Madrigal routine questions, Madrigal's behavior aroused the agent's suspicion. Eventually, Oldman asked for permission to inspect the cargo, and Madrigal consented. When he entered the trailer and inspected the cargo, Oldman readily noticed that the cartons of fig paste were placed in a pattern (which he described as being like a "hopscotch box") which left empty spaces in the interior of the trailer and that cardboard boxes covered with cellophane had been placed in some of these cavities. These cellophane covered boxes were quite different in size and appearance from the other cartons and appeared to have been carelessly tossed in, in contrast to the carefully placed cartons of fig paste. With Madrigal's consent, Oldman opened one of the boxes and discovered marijuana. Madrigal was arrested. A total of 302 pounds of marijuana was recovered from the boxes in the trailer after Madrigal's arrest.

## I

Madrigal was indicted on one count of possession of more than 100 kilograms of marijuana with intent to distribute, a violation of 21 U.S.C. § 841(a). He was convicted after a jury trial. Because of the quantity of marijuana involved and because Madrigal had one previous conviction for a felony drug offense, upon conviction he was subject to a mandatory minimum prison term of 120 months. 21

U.S.C. § 841(b)(1)(B).[1]   Because the sentencing range calculated under the

Sentencing Guidelines was less than that, defendant was sentenced to the statutory

minimum.  Madrigal now brings this appeal, raising only the issue of whether the

evidence was sufficient to support his conviction.  Our jurisdiction is based on 28

U.S.C. § 1291.


# II

We review the sufficiency of the evidence in a criminal case *de novo*.  *United

States v. McDermott*, 64 F.3d 1448, 1457 (10th Cir. 1995).  A reviewing court does

not re-weigh the evidence, nor does it

> "ask itself whether *it* believes that the evidence at the trial established
> guilt beyond a reasonable doubt."  Instead, the relevant question is
> whether, after viewing the evidence in the light most favorable to the
> prosecution, *any* rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt.

---

[1]The statutory minimum applies when the offense was committed after a former felony drug conviction had become final.  Here, the judgment recites that in 1986 the defendant was convicted of possession of a controlled substance in state court in California, for which he was sentenced to jail for 54 days.  Because of the impact on the defendant's sentence, we have been concerned whether this California conviction was for a felony. Pursuant to Fed. R. App. P. 10(e)(2), we ordered supplementation of the record with the presentence report and the information filed by the government under 21 U.S.C. § 851(a)(1). Neither of these documents cites the state statute under which Madrigal was convicted in 1986.  We feel the burden must be and is on the appellant to raise the issue if there be any impediment to the use of this conviction to enhance the sentence in the instant case.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (quoting *Woodby v. I.N.S.*, 385 U.S. 276, 282 (1966)).

To support a conviction for the offense of possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a), the evidence must prove beyond a reasonable doubt that the defendant knowingly possessed the illegal substance, and that the defendant had the specific intent to distribute the contraband. *United States v. Reece*, 86 F.3d 994, 996 (10th Cir. 1996). Our review of the record reveals that at trial Madrigal challenged the government's evidence only on the first element, whether he was knowingly in possession of the marijuana. Similarly, in this appeal Madrigal contends only that the evidence was insufficient on this element of the crime. In essence, Madrigal's theory is that someone else could have been responsible for putting the marijuana in the truck and that the government's evidence was insufficient to dispel a reasonable doubt because of this possibility. We have reviewed the record carefully and we disagree with Madrigal's contention.

The arrangements for Madrigal to transport the load of fig paste were made by Mr. Steve Serpa, a broker with West Florida Transport, Inc., who was the first witness called at trial. Madrigal had carried loads for West Florida about six times in the past. This load was being shipped by a company identified as Valley Fig Growers and was to be loaded on September 10, 1997, from Valley Fig's docks in Fresno. Madrigal

lived in Rialto, which is east of Los Angeles in San Bernardino County, a four or five hour drive from Fresno.

When Madrigal arrived at the Valley Fig facility he met briefly with the distribution manager, Malcolm Mitchinson. Mitchinson gave Madrigal a seal which was to be placed on the trailer's doors after loading. Use of these seals assures the recipient that the cargo has not been disturbed in transit from the shipper. Mitchinson also gave Madrigal a bill of lading, which contained an identifying number for the seal. Madrigal then proceeded to the dock to have the cargo loaded into his trailer.

Paul Mejia was working on the docks that day and loaded the cargo of fig paste into Madrigal's trailer. Mejia testified that he asked Madrigal how he wanted the cargo loaded and that Madrigal selected the pattern, which Agent Oldman later described as resembling a hop scotch box. This pattern is used to distribute the weight of the load evenly over the trailer's wheels. Tr. 71-72. Mejia testified that the trailer was empty when he began loading it and that he loaded nothing but sixteen pallets of fig paste. *Id*. at 66-67. Mejia said that defendant closed the doors of the trailer and that he, Mejia, went on to his next task at that time. Consequently, Mejia did not see whether or not Madrigal affixed the seal to the doors before leaving the premises of Valley Fig. *Id*. at 67-68. Both Mejia and Mitchinson testified that at the time of these events it was the practice at Valley Fig to allow the drivers to affix the

seals. *Id*. at 54, 74.

By using documents recovered from the truck after Madrigal's arrest, including the log books which all truckers are required to keep, the government was able to present evidence regarding Madrigal's activities from the time that he left the Valley Fig docks until he appeared at the Interstate 25 checkpoint two days later. Mr. Rick Cox, an inspector with the New Mexico Motor Transportation Department, testified about his review of Madrigal's log entries, *inter alia*. Cox testified that the log book showed that Madrigal did not actually begin his journey to the East Coast until about 9:00 p.m. on September 11, the day after his truck was loaded at Fresno. Defendant returned to Fontana, California (which during defendant's testimony later in the trial was established to be a town adjacent to Rialto, where defendant lived) where he parked his truck. The log book showed that the truck remained there almost 24 hours before Madrigal began the trip. (It is undisputed that during that time defendant picked up his wife and two small children, who were with him on the journey until his arrest.) In contrast to this evidence, Mr. Serpa testified that he received a telephone call from Madrigal on September 11 in which Madrigal said that he was en route and had reached New Mexico. Tr. 28, 44.

Cox also testified that other documents showed that Madrigal had his truck weighed in Colton, California, at about 9:00 p.m. on September 11, which would

have been at the very beginning of Madrigal's journey after leaving his home. (Other

testimony established that Colton, Rialto, and Fontana are all adjacent communities.)

Cox also testified, based on his previous experience in trucking, that there is a

weighing station south of Fresno, which Madrigal could have used.[2]

Agent Oldman testified that he was on duty at the primary checkpoint north of

Las Cruces on the evening of September 12 when Madrigal drove up. Oldman asked

him if he was a citizen of the United States, and Madrigal replied that he was. Later

it was determined that Madrigal is a citizen of Mexico who is legally in this country

as a permanent resident. Oldman testified that he noticed Madrigal looking down

---

[2]The government also introduced evidence at trial that the route taken by Madrigal was more than 300 miles longer than the shortest route available to him, which would have been to use Interstate 40 from its western end in Barstow, California, to Albuquerque and beyond. Instead, Madrigal chose to follow Interstate 10 through Phoeniz and Tuscon until he turned onto Interstate 25 at Las Cruces, New Mexico just before his arrest. Madrigal testified that he planned to follow I-25 to Albuquerque where he would turn east on I-40 and that he had chosen this route to avoid steep climbs on I-40 in Arizona because he had just had his engine rebuilt and needed to avoid unnecessary strain on the new engine during a break-in period.

Although the government challenged this explanation and seemed to argue that this choice somehow bore on the issue of Madrigal's culpability, and continues to do so on appeal, we fail to see the connection. The government's theory was and is that Madrigal probably obtained and loaded the marijuana during the 22 hours he spent in the vicinity of his home in the San Bernardino area. The government fails to explain how Madrigal's choice of travel plans afterwards has any bearing on the reasonableness of this crucial inference from the evidence. Nevertheless, we agree that the jury could have reasonably drawn the conclusion that Madrigal did in fact delay the start of his journey in order to obtain and load the marijuana before having his truck weighed in Colton.

instead of looking at him as he answered. Oldman next asked Madrigal what he was hauling. Madrigal then looked at him, smiled and said, "I'm carrying jelly, sir." Agent Oldman then asked where Madrigal's journey had originated, and Madrigal told him Fresno. After noting the presence of Mr. Madrigal's wife and asking her citizenship, Agent Oldman asked to see the "manifest," the documentation regarding Madrigal's trip. Oldman had already noticed that Madrigal seldom looked at him, and then usually only for a fleeting glance. Now, as Madrigal looked through a stack of papers for the manifest, Oldman noticed that Madrigal's hands were "trembling very violently." Tr. 88. Oldman also noted that Madrigal's breathing seemed to be very rapid and shallow. These apparent signs of nervousness made Oldman suspicious.

Oldman noticed that Madrigal's hand was "still shaking violently" as he presented the manifest through the truck window. *Id*. at 89. Oldman then walked to the back of the trailer and confirmed that the number on the seal matched that on the manifest. Oldman asked Madrigal for permission to search the truck and Madrigal consented. *Id.* 90-91.[3] The agent then directed Madrigal to move the truck over to a secondary inspection area. There, Oldman asked to see Madrigal's driver's license

---

[3]In this appeal defendant does not contend that his consent was not validly obtained, nor does he challenge the search on any other grounds. It does not appear that any challenge to the search was made in the district court, either.

-8-

and noticed that his hands were still shaking as he produced it. *Id*. at 92.

Upon entering the trailer, Agent Oldman noticed the "hopscotch box" pattern in which the cartons of fig paste had been loaded, and he also quickly noticed the other, distinctively different cardboard boxes, as we have already described. Oldman picked up one of these boxes and took it back to the rear of the trailer where he asked Madrigal what the box was and what was inside the box. Madrigal responded, according to Oldman's testimony, by looking down and mumbling, "I don't know what it is or what's in it." *Id.* at 95. Oldman then asked for permission to open the box. Madrigal's response was mumbled and unclear. Oldman then asked him for a definite answer. Madrigal looked up, threw his arms up and said, "Go ahead, open it." Tr. 95. The parties stipulated that the boxes contained 302 pounds of marijuana. *Id*. at 96.

Madrigal testified that there were two or three people who loaded his truck while he was working on the trailer's refrigeration unit. He said that by the time he had taken care of a problem with the refrigeration unit and gotten it started, the trailer was fully loaded. Tr. 235-36. He entered the trailer and put in place devices called "load locks," which are used to keep the cargo from shifting during transport. He testified that the dock workers were with him as he did this, and, although this is not entirely clear from the testimony, he seemed to indicate that positioning the load

locks required him only to enter the back of the trailer.[4]  He testified that he was then told that he would have to pull the truck forward a few feet so that the trailer doors could be closed.  He said that the dock workers then closed the trailer doors and affixed the seal.

Defendant testified that he was not nervous when he stopped at the check point and talked with Agent Oldman.  He said that his hands were not shaking and that he was not even asked to produce any documents until he had already consented to having the cargo inspected and had moved his vehicle to the secondary inspection area.  Madrigal testified that when Oldman showed him one of the cellophane wrapped boxes that had been found in the trailer and asked for permission to open them, that he replied, "Sure, no problem.  Go ahead and open it if you want." *Id*. at 246.  Madrigal denied putting the marijuana in the trailer and testified that he had no idea how the contraband got there. *Id*. at 249.

Madrigal testified that receipts he presented at trial showed that the engine of the tractor had recently been rebuilt on September 2, 1997; that Madrigal was told not to push the engine too hard and to avoid steep climbs; and that for this reason he

---

[4]Defendant was asked, "[A]fter the load is placed inside that trailer, you went in there and put those load locks on there, right?"  Defendant's answer was, "Just that far."  Tr. 259.

chose the I-10 route which was flatter, although a couple of hundred miles longer. Tr. 228-29; 239-40.

Viewing this evidence in the light most favorable to the government, we conclude and hold that the evidence was sufficient for a rational jury to find the defendant guilty beyond a reasonable doubt. Madrigal testified in his defense that someone else put the seal on the trailer before he left the Valley Fig docks. Since the seal was unbroken when he arrived at the Border Patrol checkpoint, he asserts that the marijuana must have been put in the trailer by someone else at Valley Fig. The evidence did show that dock workers like Mejia had access to documents showing where each load was to be shipped. This is no basis on which we could overturn a jury verdict, however. As Madrigal concedes, it is not necessary that the evidence conclusively negate all other possibilities except guilt. United States v. Johnson, 42 F.3d 1312, 1319 (10th Cir. 1994).

In essence, the jury was presented with a fairly straightforward problem of conflicting testimony, requiring the jury to determine which witnesses were the most credible. Mejia testified that he loaded no contraband into the trailer and that he had not seen Madrigal seal the trailer before leaving the Valley Fig loading docks. Madrigal testified that someone at Valley Fig closed the trailer doors and affixed the seal.

The jury had other evidence which it could use in resolving the conflicts in the testimony. The government's evidence showed that Madrigal had stopped over near his home for about 22 hours before beginning his trip[5] and that he chose to have the trailer weighed near his home, after this long layover, rather than at the first weigh station he passed on leaving Fresno. Thus, the evidence cited by Madrigal that the trailer weighed the same on entering New Mexico as it did when weighed at the start of his journey in California does not aid Madrigal much, if any. We also think that the jury could properly consider Madrigal's nervous behavior at the checkpoint[6] and the apparent air of resignation in his consent for Agent Oldman to open the cardboard box (assuming as we must on review that the jury credited Oldman's version of the encounter) in determining that Madrigal's testimony lacked credibility. It is also noteworthy that Madrigal's theory of the case would have required the jury to infer that someone was willing to commit a quantity of marijuana valued at over $200,000 to transport by an unwitting driver.

---

[5]Madrigal's log book showed that he had not hauled any loads for at least ten days prior to this trip, making it the more unusual that he felt he could afford to delay his departure on this trip.

[6]In other contexts we have held that evidence of nervousness, alone, is of minimal weight, but we have often considered such evidence in combination with other evidence as being probative. *See, e.g., United States v. Soto-Cervantes*, 138 F.3d 1319, 1324 (10th Cir. 1998).

We believe that the circumstantial evidence presented in this case did not require the jury to enter the realm of pure speculation but instead was sufficient to support rational inferences leading to the conclusion that defendant was guilty beyond a reasonable doubt. *See United States v. Nicholson*, 17 F.3d 1294, 1298-99 (10th Cir. 1994) (defendant's ownership of vehicle in which he was sole occupant, together with presence of defendant's personal effects in the vehicle, and defendant's "false statements, evasions, and contradictory statements" sufficient to support inference that defendant knew of presence of contraband). In short, we are satisfied that the jury's verdict has sufficient support in the evidentiary record, and accordingly the judgment of the district court is **AFFIRMED.**

Entered for the Court

William J. Holloway, Jr.
Circuit Judge

-13-