**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 13 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GUADALUPE SOTO-CERVANTES,

Defendant - Appellant.

No. 97-2019

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D. Ct. No. 96-CR-277-JP)**

---

Jerry A. Walz, Albuquerque, New Mexico, for Defendant-Appellant.

Fred J. Federici, Assistant U.S. Attorney (John J. Kelly, United States Attorney, and James D. Tierney, Assistant U.S. Attorney, on the briefs), Office of the United States Attorney for the District of New Mexico, Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **TACHA**, **HENRY**, and **LUCERO**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

Defendant Guadalupe Soto-Cervantes was charged in the United States

District Court for the District of New Mexico with reentering the United States

after being deported subsequent to conviction of an aggravated felony, in violation of 8 U.S.C. §§ 1326(a) and 1326 (b)(2). Defendant filed a motion to suppress documentary evidence (specifically, a resident alien card) and/or dismiss the indictment. The district court denied the motion. The defendant entered a conditional guilty plea, reserving the right to appeal the district court's denial of his motion to suppress. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

At approximately 12:45 p.m. on May 9th, 1996, Bernalillo County Sheriff's Deputies Mickey Phalen and Dave West were dispatched to 517 Sunnyslope Southeast on the basis of an anonymous tip that drug distribution activity was occurring at that location. The anonymous caller had stated that the drug activity involved Mexican nationals and a grey pickup truck. The 500 block of Sunnyslope and the surrounding area is known for drug activity; Deputy West himself had assisted in the execution of a search warrant in that block in the previous month. At the scene, the two deputies observed a group of four or five individuals scattered around an adobe wall and four vehicles, including a grey truck, parked in the street nearby. As the deputies arrived, one of the individuals (not the defendant) quickly walked behind the wall and then returned moments later. Deputy Phalen looked behind the wall but found nothing. Two more

deputies, Ross Baca and Louis Holguin, arrived. Deputy Holguin patted down each of the individuals for weapons. No weapons or contraband were found on the defendant. The officers asked the men to produce identification. The defendant and one other individual produced alien registration cards, while two individuals said they did not have identification on them. One of the individuals without identification told Deputy Holguin that he was in the United States illegally.[1] The defendant and his companions appeared nervous while they were being questioned about their identification. The officers ran an NCIC check on defendant's identification card. That check came back negative, showing that there were no outstanding warrants for his arrest. In Deputy Holguin's experience, approximately 50 percent of alien registration cards shown to him have turned out to be fake. Deputy Holguin recommended that immigration officers be called in, and at about 1:08 p.m., one of the deputies placed a request for Immigration and Naturalization Service (INS) agents to come to the scene. INS Agent Joseph Garcia arrived approximately twenty minutes later, at about 1:30. In the meantime, the deputies continued to search the immediate area and found a scale, three heroin cookers, several baggies, and a used syringe. Some of

---

[1] The defendant argues that none of the individuals admitted being in the country illegally until later, when the INS agent arrived on the scene. As we discuss later in this opinion, however, we do not rely on the individual's alleged admission of illegal status in determining that the officers had reasonable suspicion for detaining the defendant. Thus, any factual dispute on this point is irrelevant.

these items appeared to have been there for a while—at least since the previous day. The deputies did not make any drug arrests. After Agent Garcia arrived, he examined the defendant's identification card and noticed a suspicious discrepancy between the numbers on the front and back of the card. He became more suspicious upon noticing that the card had been issued three times, suggesting that the defendant previously had been deported. Agent Garcia previously had received reports that there were "drop houses"—that is, houses where illegal aliens stay temporarily after crossing the Mexican border—in the area of the 500 block of Sunnyslope. He ran an immigration check and discovered that the defendant previously had been deported following a conviction for an aggravated felony. The defendant was arrested between 1:45 and 1:50.

## DISCUSSION

The defendant seeks the suppression of the alien registration card, arguing that it was the fruit of an illegal detention. On appeal from the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous. See United States v. Botero-Ospina, 71 F.3d 783, 785 (10th Cir. 1995) (en banc). "The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law which we review de novo." Id.

We agree with the district court, and with the parties, that the detention here should be treated as an investigative detention. See United States v. Davis,

94 F.3d 1465, 1468 (10th Cir. 1996) (describing investigative detention as a seizure "of limited scope and duration"). To determine whether an investigative detention was constitutionally permitted, we must ask both "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968). A law enforcement officer may stop and briefly detain a person for investigative purposes "if the officer has a reasonable suspicion . . . that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989). Once the concern that justified the initial stop is dispelled, further detention will violate the Fourth Amendment unless the additional detention is supported by a reasonable suspicion of criminal activity. See United States v. Alarcon-Gonzalez, 73 F.3d 289, 292-93 (10th Cir. 1996). In other words, reasonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout.

An officer must be able to point to "specific and articulable facts" to support a finding of reasonable suspicion; an "inchoate and unparticularized suspicion or 'hunch'" is insufficient. Terry, 392 U.S. at 21, 27. "Whether . . . an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend on any one factor but on the totality of the circumstances." United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993).

Like the district court, we address the defendant's detention in three stages.

1.      <u>Initial Detention on Suspicion of Drug Activity (12:45 - 1:08)</u>

The defendant first argues that the officers lacked the requisite reasonable suspicion to justify his initial detention, which lasted approximately twenty minutes while the officers investigated possible drug activity. We concur with the district court's conclusion that the officers had reasonable suspicion for this period of the detention. We disagree, however, with the district court's reasoning on this point.

The officers had received a tip that included several specific pieces of information. The tip named a particular address, described a group of men, and identified a particular vehicle. When the officers arrived at that address, they verified the presence of the men and the vehicle described by the tipster. While the verification of those facts may have increased the officer's confidence in the tipster's information, it did not provide enough reasonable suspicion by itself to justify the stop. We disagree with the district court's statement that "since the tipster's assertions [about the men and the car] were substantially corroborated, the claim regarding participation in criminal activity was probably also true." <u>United States v. Soto-Cervantes</u>, No. 96-277-JP, slip op. at 9 (D.N.M., Sep. 2, 1996). The district court cited <u>Alabama v. White</u>, 496 U.S. 325 (1990), and <u>United States v. Elkins</u>, 70 F.3d 81 (10th Cir. 1995), for its conclusion. In <u>Elkins</u>,

"several weeks of observation and independent investigation" by detectives corroborated the information in the tip, Elkins, 70 F.3d at 83, while in White, the tip was deemed reliable largely because the tipster accurately predicted a third party's future actions, see White, 496 U.S. at 332. These critical circumstances were not present in this case.

The tip here was too general to support reasonable suspicion by itself. "A confidential tip may justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur." United States v. Leos-Quijada, 107 F.3d 786, 792 (10th Cir. 1997) (citing White, 496 U.S. at 328-330, and Elkins, 70 F.3d at 83) (emphasis added). The verification of facts readily observable to anyone on the street, without more, is insufficient to support a reasonable suspicion that criminal conduct is occurring. The fact that the tipster accurately described a particular group of men does not, as the district court suggested, mean that the tipster also was correct that the men were engaged in drug dealing. On the other hand, police are not required to ignore allegations of criminal activity. Although the tip in this case was not sufficiently reliable to support reasonable suspicion by itself, we will treat the tip as a factor to be considered. At minimum, the tip allowed the officers to identify the men before them as those alleged to be dealing drugs. The

tip, when combined with other factors, justified the officers in a brief investigation detention to investigate the allegations of drug activity.

Looking at the totality of the circumstances, then, we find that the requisite reasonable suspicion was present. Deputy West knew that drug activity was not uncommon in the neighborhood. While the fact that an individual is in a neighborhood known for drug activity is not sufficient by itself to support a reasonable suspicion that the individual himself is engaged in criminal activity, see Brown v. Texas, 443 U.S. 47, 52 (1979), it can support a finding of reasonable suspicion when combined with other factors. See United States v. Gutierrez-Daniez, 131 F.3d 939, 942-43 (10th Cir. 1997). Moreover, as the deputies approached, they saw one of the men briefly disappear behind the wall. Although the officers did not observe the man drop anything behind the wall, we agree with the district court that the action could support an inference that the man had left to hide something upon spotting the officers. The tip, the neighborhood's reputation, and the man's action combined to give the officers reasonable suspicion to detain the men long enough to determine whether they were in fact engaging in drug activity.

Our next inquiry then, is whether the officers detained the men longer than necessary to confirm or dispel their suspicions regarding drug activity. See Terry, 392 U.S. at 19-20 (stating that scope of investigative detention must be

reasonably related to circumstances which justified interference in the first place). The men were detained for approximately twenty minutes while the officers searched the area, patted them down, and asked for identification.[2] This length of time was not unreasonable. See United States v. Sharpe, 470 U.S. 675, 686-88 (1985) (finding that 20-minute delay was not inherently unreasonable). There is no evidence that the police took more time than was necessary to investigate the suspected drug activity; they diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.

2.      Detention Until Arrival of INS Agent (1:08 - 1:30)

Although the defendant had produced an identification card, the deputies in this case were justified in detaining him until they could verify that the card was genuine, even though they no longer suspected him of illegal drug activity. Deputy Holguin testified that he knew alien registration cards were easy to fake and that he was aware of a high rate of fake documentation (approximately 50 percent, in his experience, turned out to be fake). He further testified that he did not have the expertise to determine whether the defendant's identification card was genuine or fake, so he and the other deputies requested the assistance of INS officers to determine whether the card was genuine. Under these circumstances,

---

[2] The defendant conceded at the suppression hearing that the pat-down and the requests for identification were permissible if the court determined that the detention was supported by reasonable suspicion.

the fact that the documentation did not appear to the deputies to be obviously fake does not prevent them from calling in the INS agents to make a more experienced evaluation. By calling INS agents to the scene, the officers were pursuing a means of investigation that was likely to confirm or dispel their suspicions quickly. The fifteen to twenty minute detention necessary to allow INS officers to reach the scene was not unreasonable. See Sharpe, 470 U.S. at 686-88.

We agree with the government that other circumstances also supported a reasonable suspicion that the defendant might be in the country illegally. Specifically, the defendant's presence in an area known to be frequented by illegal aliens from Mexico, his nervousness upon being asked for identification, and Deputy Holguin's knowledge of the high rate of fake documentation gave the officers reasonable suspicion that the defendant may have been in the country illegally. A neighborhood's reputation for housing illegal immigrants alone cannot support a finding of reasonable suspicion as to an individual found in that neighborhood, see Brown, 443 U.S. at 52, but it is a relevant factor to be considered, see Gutierrez-Daniez, 131 F.3d at 942-43 (finding that police officer's knowledge that drug dealers and illegal immigrants congregated in a particular area could be considered, along with more particularized factors, to support reasonable suspicion). In the same vein, a defendant's nervousness is not enough, without more, to support a finding of reasonable suspicion, see United

States v. Hall, 978 F.2d 616, 621-22 & n.4 (10th Cir. 1992), but it too is not entirely irrelevant, see Gutierrez-Daniez, 131 F.3d at 943. Looking at the totality of the circumstances, we find that the officers possessed the requisite reasonable suspicion to detain the defendant for an immigration check even though their drug inquiries were complete.

We note that the officers apparently decided to detain the entire group of four or five individuals, including the defendant, to verify their identification and immigration status in part because two of the men in the group lacked any identification and one of them admitted that he was in the country illegally. We decline to base the reasonableness of the defendant's detention on the actions or status of the other men in his group and rely instead on the circumstances discussed above. See Whren v. United States, 116 S. Ct. 1769, 1774 (1996) (noting that subjective intent of officer does not invalidate otherwise lawful conduct).

Defendant argues that once the NCIC check came back negative, he should have been allowed to leave. However, the NCIC report only informed the officers that there were no outstanding warrants for the defendant. It did not provide any information regarding immigration status. Therefore, the officers were not required to let him go on the basis of the negative NCIC report.

3.     Detention after the Arrival of the INS Agent (1:30 - 1:50)

Finally, the defendant contends that his continued detention after the arrival of the INS agent was unreasonable. This claim also is without merit. Upon arriving at the scene, the INS agent diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, which made the brief wait constitutionally acceptable. See Sharpe, 470 U.S. at 686-88. Upon arriving, the agent examined the card and noted an apparent discrepancy.[3] The agent also noted the card had been issued multiple times, which suggested that the defendant previously had been deported. These factors justified further detention of the defendant for a reasonable amount of time while his immigration status was verified. The agent ran an immigration check, and the report of defendant's illegal status reached the agent within fifteen or twenty minutes. There is no evidence that this INS immigration check took an unusual or unreasonable amount of time.

**CONCLUSION**

For these reasons, we AFFIRM the district court's denial of defendant's motion to suppress.

---

[3] Agent Garcia testified that he later determined the card was invalid due to defendant's earlier deportation, but it was not a fake. The fact that he ultimately learned it was not a fake, however, does not mean that the agent's initial suspicions regarding the card were unreasonable.