# District of Columbia
# Court of Appeals

**No. 14-CF-665**

CIAN PRIDGEN,



FILED

APR – 7 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

Appellant,

v.

**CF2-98-14**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE:  BLACKBURNE-RIGSBY and THOMPSON, *Associate Judges*; and FERREN, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the Superior Court is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated:  April 7, 2016.

Opinion by Associate Judge Phyllis D. Thompson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-665

FILED 4/7/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

CIAN PRIDGEN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-98-14)

(Hon. Ronna Lee Beck, Trial Judge)

(Argued January 13, 2016                                    Decided April 7, 2016)

*Mindy Daniels* for appellant.

*Peter S. Smith*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Karen Seifert*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and THOMPSON, *Associate Judges*, and FERREN, *Senior Judge*.

THOMPSON, *Associate Judge*:    A jury convicted appellant Cian Pridgen of carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition, and (with appellant having waived a jury trial on the charge) the court thereafter found him guilty of possession of a firearm by a

convicted felon. He seeks reversal of his convictions on the ground that the trial court erroneously denied his motion to suppress the tangible evidence against him, which he contends was the fruit of an unlawful seizure. We affirm.

**I.**

At the hearing on appellant's motion to suppress, Metropolitan Police Department (MPD) Officer Jordan Katz testified that on the evening of December 31, 2013, he and two other MPD officers were on patrol near 3311 10th Place, S.E., an area that Katz patrolled daily.[1] The three officers, dressed in plain clothes but with tactical vests that had "Police" across the chest,[2] were driving through the

---

[1] The officers were part of the MPD Gun Recovery Unit, whose "main goal" was "to arrest people with guns." Officer Katz described the area the officers were patrolling as "one of our better areas for catching people with guns."

[2] Officer Katz testified that, from "outside the car, unless you are a child, . . . you can see the writing" on the vests. The government introduced Exhibit 22, depicting what Officer Katz and one of the other officers were wearing. The word "Police" is visible in large white letters that appear to be a few inches below the neckline.

area in an unmarked Ford Explorer with Florida tags with its windows down,[3] "looking for people with guns." A few minutes before midnight, Officer Katz spotted a man — appellant — who was about thirty yards away and who was walking quickly on a footpath near an apartment building, following a path that would ultimately cross in front of the officers. At one point, Officer Katz testified, appellant "stared right at" the officers and then continued at his "quick[]" pace toward the door" of the nearby apartment building.[4] Officer Katz testified that he then shined his flashlight on appellant, leaned out of his vehicle window, and "loud[ly] shout[ed]," "[H]ey, do you got a gun[?] [D]o you got a gun[?]" Appellant took a couple of steps and then began to run to the door of the apartment building. As he ran, he was moving his right hand, but he kept the palm of his left hand pressed against his jacket on his left side.

The officers exited their vehicle and followed appellant to the apartment building. Right after appellant got inside the building, the officers saw him drop a cell phone, which he did not stop to retrieve, even after the building door locked

---

[3] Although the only indications on the vehicle that it was a law enforcement vehicle were "lights in the dashboard in the back[,]" Officer Katz testified that people in the neighborhood "kn[e]w" it was a police vehicle.

[4] At this point, Officer Katz testified, he had a "hunch" that "this guy has got a gun[.] [H]e is going to run."

behind him. Instead, appellant ran up the stairs to the door of an apartment unit, continuing to hold his left side. The apartment building had a glass front, and the officers could see appellant with his body pressed against an apartment door but with his left hand "moving all around that left jacket pocket" as he was "struggl[ing]" to get inside the apartment unit. The officers entered the building after "a little kid" let them in. They drew their guns and were "screaming" at appellant to "stop, get on the ground," but appellant did not respond to their demands.[5] Officer Katz thought at that point that appellant "has probably got a gun."[6] The third officer grabbed appellant, and the officers together forced him to the ground, face down, and eventually handcuffed him, after pulling his hands away from his waistband.[7]

Officer Katz testified that as he then reached under appellant's left side, which appellant was keeping "pinned against the ground[,]" he could feel the handle of a gun. In addition, appellant's jacket "had flipped over" as the officers

---

[5] Officer Katz acknowledged that the officers at no point verbally identified themselves to appellant as police officers.

[6] Officer Katz explained that, for that reason, he did not try to grab appellant right after the officers gained entry into the building, but instead pulled his gun out, kept his distance, and told appellant to get on the ground.

[7] Officer Katz testified that his thinking was, "If I can get the hand away from his waistband, then we can be okay."

struggled to handcuff him, and Officer Katz saw a "green weed substance[]" through appellant's right, mesh pocket and a handgun in the left, mesh pocket.

The defense did not put on any witnesses. The trial court (the Honorable Ronna Beck) found that Officer Katz was "very credible" and credited his testimony "in every respect." Judge Beck then addressed whether the officers "had specific and articulable facts which taken together with rational inferences from those facts reasonably warranted the officers to believe the defendant was armed."[8] Judge Beck reasoned that a variety of relevant factors were present, including the "high[-]gun area," the "high[-]gun night" (i.e., New Year's Eve, the "most fruitful night" for recovering guns, according to Officer Katz), and the fact that appellant "was walking fast and then ran[.]" As to the last of those factors, Judge Beck recognized that the pertinent question was whether it was reasonable for the officers to assume that appellant's "flight was indicative of consciousness of guilt as a result of police presence."[9] Citing *Smith v. United States*, 558 A.2d 312 (D.C.

---

[8] Judge Beck appeared to be partially paraphrasing *Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.").

[9] Judge Beck acknowledged that there was "a scary situation created by the officers" and that the alternative possibilities the officers needed to consider included (1) that appellant was "frightened because somebody is yelling at him

(continued…)

1989),[10] Judge Beck reasoned that the fact that other people in the neighborhood recognized the officers' vehicle as a police vehicle was not enough to establish that appellant was aware of a police presence. She observed, however, that "there was more here." Specifically, she focused on the evidence that the police vests "were potentially visible through open windows[,]" on Officer Katz's testimony that appellant looked in the direction of the vehicle and subsequently ran, and on Officer Katz's having leaned out of the vehicle window and yelled "do you have a gun[,]" all of which the court found "support[] the reasonable conclusion that the defendant's . . . flight was consistent with consciousness of guilt in response to the police presence." Judge Beck also relied on the evidence that appellant "acted in a particularly desperate effort to get away[,]" not stopping to retrieve his dropped cell phone even though he "now . . . ha[d] a locked door . . . safeguarding him." At that point, Judge Beck found, the officers' police vests would have been "very visible" to appellant. Judge Beck determined that these additional facts made it

---

(…continued)
about a gun on a dark night[,]" and (2) that appellant "ha[d] a gun." The court asked defense counsel to address why one possibility had to be rejected in favor of the other.

   [10] In *Smith*, this court "reject[ed] th[e] notion of locational taint whereby an individual's behavior is explained by reference to what others in that area or neighborhood may know about" police operations. 558 A.2d at 317.

reasonable for the officers to believe that appellant's "response was to a police presence."

Judge Beck next focused on what she called the "additional critical fact in evaluating whether [the officers had a basis for] reasonable articulable suspicion that [appellant] was armed":  the fact that "when [appellant] ran, he put his hand up to his left side at the same time that his right arm was swinging normally for running motion, which was consistent with the officer's knowledge of how people act when holding a gun in their waistband or pocket."  Judge Beck also cited the evidence that appellant was "continuing his movements on his left side ["which he had been holding when running[]"] . . . while frantically trying to get in[to] th[e] apartment[.]"

Judge Beck found that "in combination," the foregoing facts provided the police with reasonable articulable suspicion that appellant was armed.  In that circumstance, the judge concluded, it was reasonable for the officers to draw their guns and to order appellant to the ground, and it also was reasonable for them to believe appellant knew they were police officers.  Judge Beck further concluded that when appellant did not comply with the officers' orders, it was reasonable for the officers, who faced a "very dangerous situation," to restrain appellant "until

they could investigate the situation further" and ascertain whether their suspicion that he was armed was accurate. Judge Beck therefore denied the motion to suppress, reasoning that the officers lawfully seized appellant, and lawfully arrested him upon probable cause after they found a gun and drugs in the course of trying to restrain him.

Appellant now urges us to reverse his convictions, contending that the tangible evidence that provided the foundation for the charges against him was unlawfully obtained. Specifically, he argues the facts known to the police officers were insufficient to give them a reasonable articulable basis for seizing him. For the reasons that follow, we disagree.

## II.

The Fourth Amendment guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. It is well-established, however, that, consistent with the Fourth Amendment, an officer may conduct a brief stop (a seizure) "for investigatory

purposes" when he has "reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity[.]" *Robinson v. United States*, 76 A.3d 329, 335-36 (D.C. 2013) (internal quotation omitted). If, during the investigatory seizure, the officer "has reasonable, articulable suspicion that the person detained is armed and dangerous, an officer may also conduct a protective frisk for weapons[,]" *id.* at 336 (internal quotation marks and brackets omitted), which may entail the use of handcuffs to restrain the suspect, *see Henson v. United States*, 55 A.3d 859, 862 (D.C. 2012).[11]

Reasonable articulable suspicion "requires substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence[,]" *id.* at 867 (internal quotation marks omitted), but is not a "toothless" standard, *Robinson*, 76 A.3d at 336. An officer may not rely on "[u]nparticularized suspicion" and "inarticulate hunches" to conduct an investigatory stop, nor may he rely on his subjective good faith. *Id.* Instead, an officer's reasonable suspicion must be based on "the facts available to the officer at the moment of the seizure or the search[,]" and such facts must "warrant a man of reasonable caution in the

---

[11]    *See also United States v. Walker*, 555 F.3d 716, 721 (8th Cir. 2009) ("Protective searches allow for the use of handcuffs."); *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989) (stating that a suspect may be in handcuffs during the protective frisk).

belief that the action taken was appropriate." *Id.* (internal quotation marks omitted). To determine whether police officers had reasonable suspicion, a court must review the totality of the circumstances present. *Singleton v. United States*, 998 A.2d 295, 300 (D.C. 2010).

This court's review of the trial court's denial of a motion to suppress is limited. *Henson*, 55 A.3d at 863. "[W]e review the hearing court's fact finding only for clear error and review the facts and all reasonable inferences therefrom in the light most favorable to the party prevailing before the hearing court, in this case the government." *Robinson*, 76 A.3d at 335 (citation omitted). "However, legal conclusions on Fourth Amendment issues, including whether a seizure . . . was justified by reasonable articulable suspicion, are legal questions that we review *de novo*." *Henson*, 55 A.3d at 863 (internal quotation marks omitted). Specifically, "we review *de novo* whether the prosecution met its burden of proving by a preponderance of the evidence that a seizure was constitutionally permissible." *In re D.M.*, 94 A.3d 760, 764 (D.C. 2014); *see United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

**III.**

Our analysis of whether the officers had reasonable articulable suspicion to seize appellant must begin with an identification of when precisely appellant was seized. *See Plummer v. United States*, 983 A.2d 323, 331 (D.C. 2009) ("'[T]he threshold question is . . . when a seizure occurred.'") (quoting *Jackson v. United States*, 805 A.2d 979, 983 (D.C. 2002) (internal quotation marks, brackets and other alterations omitted)). A seizure occurs when an officer "terminates or restrains [an individual's] freedom of movement." *Henson*, 55 A.3d at 863. (internal quotation marks omitted). "An unsuccessful attempt to detain a suspect is not a seizure[.]" *Id.* at 864 (initial capitalization omitted).

In this case, we conclude that appellant was seized only when one of the officers grabbed him and the officers took him to the ground.[12] Immediately before that, when the officers pointed their guns at appellant and directed him to

_____

[12] Nor did Officer Katz seize appellant by shouting at him to ask whether he had a gun. *See Florida v. Royer*, 460 U.S. 491, 497 (1983) ("[L]law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting some questions to him if the person is willing to listen[.]").

stop and get on the ground, he did not comply;[13] even to the extent that he stood still at the apartment door he was trying to open, he ignored the officers' requests that he get on the ground, and he kept moving his hand around his left side. Thus, our analysis must focus on whether, by the time the officers grabbed and tackled appellant, they had reasonable articulable suspicion that he was armed.[14]

Judge Beck correctly recognized that various factors in the totality of the circumstances are properly considered in determining whether officers' suspicion is reasonable, "including the time of day, flight, the high crime nature of the location, . . . [and] a person's reaction to questioning . . . ." *Singleton*, 998 A.2d at 300 (internal quotation marks omitted).[15] However, we need not rely on Judge

---

[13] Instead, as his trial counsel put it, he "continu[ed] to move away from" the officers and "toward what turns out to be his residence."

[14] The officers did not suspect appellant of any other criminal offense.

[15] *See also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (explaining that officers are "not required to ignore the relevant characteristics of a location" and that "evasive behavior [such as headlong flight] is a pertinent factor in determining reasonable suspicion" because it is suggestive of wrongdoing); *Henson*, 55 A.3d at 868 (listing, as factors supporting reasonable suspicion and justifying the police in suspecting that Henson was involved in criminal activity and therefore in investigating further, that Henson "was walking late at night in 'one of the higher crime areas' in the police district, one in which there had been numerous weapons-related offenses[,]" that he knew that the police "wanted to know if he had any weapons on him[,]" and "in the midst of th[e] encounter with the police, [he] took off running"); *Peay v. United States*, 597 A.2d 1318, 1320 (D.C. 1991) ("Even if

(continued…)

Beck's factual finding that, at the time he began to run toward the apartment building, appellant likely recognized Officer Katz and his colleagues as police officers, or on her observation that appellant's running was at least consistent with consciousness of guilt.[16] We can take this approach because, in analyzing whether the officers had reasonable articulable suspicion by the time one of them grabbed appellant, we elect to accord no significance to the fact that appellant ran after Officer Katz shined his flashlight on appellant and yelled to him about whether he had a gun.[17] Instead, we focus entirely on what appellant did as he ran and what he did after he entered the apartment building.

---

(…continued)
each specific act . . . could be perceived in isolation as an innocent act, the observing police officer may see a combination of facts that make out an articulable suspicion.") (internal quotation marks omitted).

[16]    Thus, we need not address the evidence and circumstances appellant emphasizes: that the officers' vehicle had Florida tags; that appellant may have been blinded by Officer Katz's flashlight or the police vehicle's headlights; that appellant did not run immediately after Officer Katz yelled a question at him, but did so only after taking a few more steps at his previous pace; and that the neighborhood was one "where folks are subject to victimization on a daily basis" and might reasonably fear anyone yelling at them from a vehicle at night.

[17]    We take this approach because we are mindful that a suspect's flight at the sight of officers who are targeting him with a flashlight may provide a basis for fear of harm that has nothing to do with whether the suspect is engaged in criminal activity. *Cf. Wardlow*, 528 U.S. at 132 (Stevens, J., concurring in part, dissenting in part) ("Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police itself can be

(continued…)

We conclude that the most relevant, and ultimately dispositive, facts are (1) that appellant ran while holding his side (i.e., while "pressing his palm against his outer left jacket pocket while running"); (2) that the officers saw appellant drop a cell phone and then continue to run while holding his hand against his left jacket pocket; and (3) that appellant continued to move his hand around his left pocket even after the officers — wearing police vests that Judge Beck found were very visible to appellant at that point — shouted to him to stop and get on the ground. We briefly discuss the significance of each of these factors.

We agree with Judge Beck that a "critical fact" in evaluating whether the officers had a basis for reasonable articulable suspicion was that, during the entire time appellant was running, he held his hand against his left side. In response to a question from Judge Beck, Officer Katz explained the "significance to [him]" of appellant's holding his side:

---

(…continued)
dangerous, apart from any criminal activity associated with the officer's sudden presence."); *Henson*, 55 A.3d at 869 (citing a situation in which an individual is trying to protect himself from harm from excessive force by police as a "circumstance[] in which an individual would be justified in fleeing from the police"); *Duhart v. United States*, 589 A.2d 895, 900 (D.C. 1991) (emphasizing that "'flight cannot imply consciousness of guilt in all cases[]'") (quoting *Smith*, 558 A.2d at 316).

> At that point, he is holding a gun, either in his waistband or in his pocket. When you run – even I do it . . . even though I have a holster on right now, I would still kind of have to . . . hold it if I ran, even with a holster. So if you have one that is not in a holster in your waistband or in your pocket, it is just something you hold onto. Even if you are skilled with a gun, you still hold onto it. When I see him holding that [left] side, the right side moving back and forth, . . . I am like, okay, he has got a gun.

In other words, Judge Beck was informed by Officer Katz's credited testimony that appellant was running in a posture that the experienced officer recognized as the way individuals tend to run when they are carrying a firearm. "[Re]view[ing] the situation through the lens of a reasonable police officer, guided by his training and experience[,]" *In re D.A.D.*, 763 A.2d 1152, 1156 (D.C. 2000),[18] we conclude that appellant's suspicious gait, taken together with the other factors already discussed (including that the officers encountered appellant in a high-gun area), moved the officers beyond Officer Katz's mere hunch and gave the officers an articulable basis for suspicion that appellant was armed.[19]

---

[18] *See also Peay*, 597 A.2d at 1322 ("[I]n judging the reasonableness of the actions of the arresting officer, the circumstances are to be viewed through the eyes of a reasonable and cautious police officer on scene, guided by his experience and training[.]") (internal quotation marks omitted).

[19] *Cf. United States v. Grayson*, No. 04 Cr. 1382 (RPP), 2005 U.S. Dist. LEXIS 12869, *17-18 (S.D.N.Y. June 30, 2005) ("Defendant fled from the police, running while holding his waistband where guns are often carried. Thus, a reasonably prudent person in Detective Infante's position would have

(continued…)

That said, even if appellant's posture was (as Judge Beck put it) "consistent with the officer's knowledge of how people act when holding a gun in their waistband or pocket[,]" it was possible that appellant was holding his side as he ran toward the apartment building because he did not want to drop a valuable item such as his cell phone. In light of that possibility, we are persuaded that the officers' articulable basis for suspicion that appellant was armed did not ripen into a reasonable suspicion that criminal activity was afoot until the officers saw appellant drop the cellphone, decline to stop and retrieve it even though the door was locked behind him, and continue to hold his side as he ran upstairs to the door of the apartment unit. Appellant's actions gave the officers a reasonable basis to believe that appellant was not holding his side merely to keep from losing a valuable item, but was holding his side to keep from dropping an item of contraband that he wanted to keep his pursuers —in visible police vests —from seeing, or an item (such as a gun) that could have posed a danger if dropped.[20]

---

(…continued)
been warranted in believing that his safety could be in danger and that the Defendant was armed and dangerous.").

[20]  It was possible, of course, that appellant was running in that manner to protect some other valuable, non-contraband item. But the officers' reasonable suspicion of a gun did not depend on their being able to eliminate every conceivable innocent explanation for appellant's posture while running. *See United States v. McCoy*, 513 F.3d 405, 415 (4th Cir. 2008) (explaining that an officer is "not obligated to eliminate every innocent explanation for his suspicion

(continued…)

The additional, critical factor is that when the officers thereafter saw appellant moving his hand around his left pocket as he stood at the apartment unit door and then drew their weapons and told him to stop and get to the ground, he did not do so, even though by that time (Judge Beck found) he would have been able to see the officers' police vests. Appellant's movements gave the officers a reasonable basis to be concerned about their safety; as Judge Beck put it, appellant's continuing to move his hand around his left pocket gave the officers a reasonable basis "to be worried [that] if [appellant] can't get in[to the apartment,] . . . he is going to turn on them with a gun[.]" *Cf. Plummer*, 983 A.2d at 333-34 (reasoning that where Plummer did not comply after the officers repeated "several times" their order that he put his hands up, his "several movements to his waist area . . . instilled safety concerns in the officers[]").

In other words, we conclude that in the totality of the circumstances, appellant's moving his hand around his left pocket gave the officers a reasonable basis to believe that he was armed and dangerous, and thus a reasonable basis for the investigatory seizure that led to the discovery of the tangible items appellant

_____

(…continued)

to be reasonable[]"); *United States v. Kaplansky*, 42 F.3d 320, 327 (6th Cir. 1994) ("[T]he police need not rule out every innocent explanation for suspicious behavior in order to justify an investigatory stop.").

sought to suppress. Accordingly, we hold that Judge Beck did not err in denying appellant's motion to suppress.

## IV.

For the foregoing reasons, the judgment of the Superior Court is hereby

*Affirmed*.