*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 22-CF-0520

DARON K. BROWN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CF2-003214)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued November 30, 2023                    Decided April 18, 2024)

*Robin M. Earnest* for appellant.

*David B. Goodhand*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *John P. Mannarino*, and *Anna C. Forgie*, Assistant United States Attorneys, were on the brief, for appellee.

Before MCLEESE, DEAHL, and HOWARD, *Associate Judges*.

DEAHL, *Associate Judge*: Daron Brown appeals his convictions for carrying a pistol without a license and the unlawful possession of a firearm. He argues that he

was unlawfully searched in violation of his Fourth Amendment rights so that the trial court erred in failing to suppress the firearm that police found on him.

The basic facts are that four police officers stopped Brown because he matched the description of an armed robber who was reported to be at his specific location. Officers handcuffed Brown and patted him down for weapons, but initially found none. The officers then asked Brown for identification, and when Brown (still handcuffed) attempted to reach into his pocket, they instructed him not to do so and asked if they could retrieve the identification for him instead. Brown then asked if one officer in particular—Jeremy Jones—could be the one to retrieve his identification, and Officer Jones agreed to do so. While reaching into Brown's pocket, Officer Jones felt what he believed to be the slide of a gun in Brown's groin area. Officer Jones then stepped back and took a moment before conducting a second pat-down and confirming that Brown had a gun in that area.

Brown moved to suppress the gun and the trial court denied the suppression motion, concluding (1) that officers had reasonable articulable suspicion to pat him down in the first instance, (2) that they had adequate justification for handcuffing him before frisking him, and (3) that the initial suspicion endured throughout the interaction and justified the second pat-down.

The parties now agree on two critical points that narrow the questions before us considerably. First, Brown concedes that officers initially had reasonable articulable suspicion to stop and frisk him, though he argues that by handcuffing him they exceeded the scope of a permissible *Terry* stop and frisk. *See Terry v. Ohio*, 392 U.S. 1 (1968). We disagree with Brown on that point and conclude that the first pat-down and the handcuffing that accompanied it were justified and did not violate his Fourth Amendment rights.

Second, the government now generally agrees that the legality of the second pat-down depends on whether Brown freely and voluntarily consented to Officer Jones's search of his pocket (contrary to the trial court's ruling, and subject to one caveat discussed below regarding the "independent source" doctrine). If Brown consented to the search of his pocket, then the fact that Officer Jones felt a gun in Brown's groin area in the course of that consented-to search unquestionably provided justification for the second pat-down. But if Brown did not consent, then that search of his pocket was illegal and the recovery of the gun was a fruit of that illegality and should have been suppressed. Because the trial court did not rule on the dispositive and fact-intensive question of whether Brown consented to Officer Jones's search of his pocket, we remand for the trial court to consider that question in the first instance.

## I. Factual Background

Brown was stopped by four police officers because he fit the description of a suspect in multiple armed robberies of the same individual. The officers had come directly from the home of a victim of those robberies, who told the officers that three intruders had broken into his home five days earlier and robbed him. One of the robbers was armed with a gun. Three days after that robbery the victim came across that same assailant again in an alley behind his apartment building and the robber put a gun to his head and robbed him again, then told him to start "running before he kill[ed]" him. When officers asked the victim if he had seen that man since that second robbery, he told them that he had just seen him about forty minutes earlier in front of a nearby McDonald's, where he would frequently hang out. He described the robber as being dark-skinned, 5'9" or 5'10", with thick, shoulder-length black dreadlocks, no face or neck tattoos, wearing blue jeans and a white t-shirt, and bearing a resemblance to the NBA player Montrezl Harrell, whose photograph he showed to the police.

The officers went to the McDonald's and saw Brown. Brown matched the description given: dark-skinned with shoulder-length dreadlocks, medium height, wearing blue jeans and a white t-shirt. The trial court found that Brown "more than kind of resembled the photo of Montrezl Harrell [that the victim had shown officers]

in facial shape, complexion, facial hair and hairstyle," and Brown does not contest that finding on appeal. Four officers approached Brown and the interaction that followed took about two minutes, though it is helpful to divide it into three distinct parts.

We will call the first part of the interaction "the first pat-down," during which three officers handcuffed and restrained Brown while patting him down. During this first pat-down, two officers handcuffed Brown and held his arms behind his back, while one of those officers patted down the right side of Brown's body including his right pants pocket, and a third officer—Brian Madison—patted Brown down more thoroughly. Officer Madison patted Brown down along his sides, his pants pockets, around his belt, down his legs, and down his back. The officers apparently felt nothing of interest and then stepped away. After the first pat-down was completed, a fourth officer—Officer Jones—asked Brown if he had any identification on him. Brown said he had it in his right pants pocket and he attempted to reach for it, which the officers told him not to do.

That brings us to the second part of the interaction, "the pocket search." After instructing Brown not to reach into his pocket to retrieve his identification, Officer Madison asked if he could go into Brown's pocket to retrieve it. Brown turned to Officer Jones, who had not participated in the first pat-down, and asked him whether

he would get the identification from Brown's pocket instead of Officer Madison. Officer Jones said "I got you, baby," then reached into Brown's pocket and retrieved the identification and handed it to Madison, all while Brown said "go ahead" several times. As Jones retrieved the identification from Brown's pocket, he felt what he thought was the slide of a gun in Brown's groin area.

Now comes the third part of the interaction, or "the second pat-down." After Officer Jones handed Brown's identification to Madison, he stepped back, visually inspected Brown, and then went back toward Brown to pat him down in the particular area where he thought he had felt the gun. After again feeling what seemed to be a gun in Brown's groin area, Officer Jones said "What's that?" and as the trial court put it, Officer Jones's "reaction on video is worth a thousand words." Officer Jones smiled wryly and said "Is that what I think it is? Man to man." When Brown said "nah," Officer Jones replied: "Yes it is. It's me now. It's me now," and alerted his fellow officers that he found a weapon. Brown appeared despondent, repeating that "this shit is over with" and asking if he could sit down. Shortly thereafter, the officers removed a handgun from Brown's groin area and arrested him.

Brown moved to suppress the gun on the grounds that the officers violated his Fourth Amendment rights when they stopped and searched him. The government

countered (1) that officers had reasonable articulable suspicion for their initial stop and pat-down of Brown, (2) that Brown then consented to the search of his pocket, and (3) that officers had reasonable articulable suspicion for the second pat-down that confirmed he had a firearm. The trial court held an evidentiary hearing on the motion to suppress and the government introduced body-worn camera footage that captured the interaction between Brown and the officers, as described above. Officer Jones also testified for the government and his credited testimony generally aligned with the body worn camera footage, with the notable addition that Jones said he saw a "bulge" in Brown's "thigh area," though he never specified if that was before or after the pocket search, saying only that he did not see the bulge when he "first approached" Brown. Brown testified for the defense and said that he did not consent to any search nor did he feel at liberty to leave when the officers approached him.

The trial court denied Brown's motion to suppress. In the court's view: (1) the officers had reasonable articulable suspicion to stop and frisk Brown, given that he matched the description of an armed robber in the area; (2) handcuffing was reasonable under the circumstances, where there was reason to think Brown was armed and dangerous; and (3) "[t]he fact that the officers missed the gun on the first

pat-down did not mean they could not" pat him down again.[1]  The court did not

opine on whether the pocket search was justified, but when Brown argued that it was

not consented to, the court responded that it was "not basing any decision . . . on

consent" and that "consent doesn't need to be a concern of yours.  I'm not going to

be finding that [Brown] consented for Fourth Amendment purposes."

A jury then convicted Brown of two counts of unlawful possession of a

firearm—one because he was a felon, and another because the gun was

unregistered—and one count of carrying a pistol without a license.  Brown now

appeals his convictions, exclusively challenging the trial court's denial of his

suppression motion.

## II.  Analysis

In reviewing a suppression motion, "we accept the trial court's findings of fact

unless they are clearly erroneous." *Hooks v. United States*, 208 A.3d 741, 745 (D.C.

2019).  But "whether the police violated a defendant's rights under the Fourth

---

[1] The trial court took this point as conceded because defense counsel, while arguing that officers lacked reasonable articulable suspicion to stop and frisk Brown altogether, seemed to agree that if officers had reasonable articulable suspicion for the first pat-down then they likewise had reasonable articulable suspicion to conduct the second pat-down.

Amendment is a legal question that we review de novo." *Bingman v. United States*, 267 A.3d 1084, 1087 (D.C. 2022).

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Consistent with the Fourth Amendment, "[a]n officer may conduct a brief stop," often referred to as a *Terry* stop, "'for investigatory purposes' when he has 'reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity.'" *Funderburk v. United States*, 260 A.3d 652, 656 (D.C. 2021) (quoting *Pridgen v. United States*, 134 A.3d 297, 301 (D.C. 2016)). "During the stop, the officer may also conduct a 'protective frisk for weapons,'" similarly known as a *Terry* frisk, "if he has a 'reasonable, articulable suspicion that the person detained is armed and dangerous.'" *Id.* (quoting *Pridgen*, 134 A.3d at 301).

In analyzing suppression claims, we consider whether there was sufficient justification at the time of each particular Fourth Amendment intrusion. *See United States v. Scott*, 987 A.2d 1180, 1195 (D.C. 2010) ("Courts must consider the scope *of the particular intrusion*, the manner in which it is conducted, [and] the justification for initiating it." (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)) (emphasis added)); *see also United States v. Kendall*, 14 F.4th 1116, 1125 (10th Cir. 2021) (examining two close-in-time searches "individually, because the justification

for each depends upon the particular circumstances underlying each search"); *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998) ("[R]easonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout.").

To pass Fourth Amendment muster, a *Terry* stop and frisk must be justified at its inception and also must remain within the scope of its justification. *See Ellison v. United States*, 238 A.3d 944, 952 (D.C. 2020) ("[W]e look to 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" (quoting *Terry*, 392 U.S. at 19-20)); *see also United States v. Lee*, 73 F.3d 1034, 1038 (10th Cir. 1996) ("We review *Terry* stop encounters in a step-by-step manner . . . examin[ing] each stage of the encounter to ensure that the government had the required amount of reasonable suspicion, probable cause, or consent to support the search."). In this case, because we conclude that there were really three relevant intrusions that raise distinct Fourth Amendment issues, we examine those three intrusions in turn: the first pat-down, the pocket search, and the second pat-down.

## A. The First Pat-Down and the Handcuffing.

Brown does not dispute that the officers had reasonable articulable suspicion to stop and frisk him for weapons. That is a wise concession. Brown matched the description of a serial armed robber and was exactly where the apparent victim claimed to have seen his assailant shortly before police arrived on the scene. We thus think it is beyond doubt that officers had reasonable articulable suspicion to seize Brown and to pat him down for weapons.

While Brown concedes that core point, he maintains that the officers exceeded the scope of a permissible *Terry* search by handcuffing him and thereby transforming his detention into an unlawful arrest unsupported by probable cause. We disagree. Officers may handcuff a suspect during a *Terry* stop if "some specific fact or circumstance . . . support[s] a reasonable belief that the use of handcuffs [i]s necessary." *Katz v. District of Columbia*, 285 A.3d 1289, 1303 (D.C. 2022) (quoting *United States v. Mohamed*, 630 F.3d 1, 7 (1st Cir. 2010)). The two most common justifications for handcuffing a suspect in the midst of a *Terry* stop are (1) that they pose "an objective safety concern," or (2) that there is some "objective reason to believe" the suspect poses a distinct "flight risk." *Id.* at 1306; *see also In re M.E.B.*, 638 A.2d 1123, 1128 (D.C. 1993) ("[C]ourts have generally upheld the use of

handcuffs in the context of a *Terry* stop where it was reasonably necessary to protect the officers' safety or to thwart a suspect's attempt to flee.").

The officers here had plenty of reason to believe that Brown posed an objective safety concern, putting aside any potential for flight, so that handcuffing him was reasonable. Not only did Brown match the description of a serial armed robber, but the victim described how one of those robberies was a chance encounter just two days earlier during which the robber put a gun to the victim's head and threatened to kill him, suggesting that the person officers were looking for was both habitually armed and willing to use his gun impetuously. That is justification enough for officers to handcuff Brown during the course of a *Terry* stop. *See Womack v. United States*, 673 A.2d 603, 609-10 (D.C. 1996) ("[T]he use of handcuffs was justified where, as here, the crime of which the defendant was suspected was a violent one and the defendant was reported to have been armed.").

Brown counters that this court recently opined, in the context of a civil suit under 42 U.S.C. § 1983, that "it is the rare case in which common sense and ordinary human experience convince us that an officer believed reasonably that an investigative stop could be effectuated safely" only via handcuffing. *Katz*, 285 A.3d at 1303 (quoting *Mwangangi v. Nielsen*, 48 F.4th 816, 827 (7th Cir. 2022)). Maybe that is true, but *Katz* concerned the very different situation where "nothing in the

record . . . provide[d] a reasonable basis to think that Mr. Katz was armed." *Id.* at 1305. So however rare the situation may be, officers are permitted to handcuff suspects who pose "an objective safety concern," *id.* at 1306, such as when they are suspected of a violent armed offense and there is reason to believe they are presently armed. *See, e.g.*, *Womack*, 673 A.2d at 610; *In re M.E.B.*, 638 A.2d at 1128. That was the case here. We thus conclude that the first pat-down, along with handcuffing Brown, was reasonable and did not violate Brown's Fourth Amendment rights.

## B. The Pocket Search

Even a search that is valid at its inception can exceed its permissible scope and thereby violate a suspect's Fourth Amendment rights. *Terry*, 392 U.S. at 19-20 ("[O]ur inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."). So we next examine the justification for the search into Brown's pocket.

While the first pat-down was supported by reasonable articulable suspicion, the government has never argued that such suspicion permitted Officer Jones to reach into Brown's pocket—which had already been patted down and seemingly cleared by other officers—to retrieve his identification. *See United States v. Adell*,

676 A.2d 446, 448 (D.C. 1996) (officer violated suspect's Fourth Amendment rights by reaching into his pocket after *Terry* pat-down revealed that pocket did not contain weapon); 4 Wayne R. LaFave, Search and Seizure § 9.6(b) (6th ed. 2020) ("[O]nce [a] pat-down has determined that the suspect is not armed, the police may not . . . once again search the suspect" absent some renewed cause to do so.); *but see Lewis v. United States*, 399 A.2d 559, 562-63 (D.C. 1979) (second *Terry* frisk was justified where first pat-down was "preliminar[y]" and "did not eliminate the possibility" that the suspect was armed (quoting *Commonwealth v. Ellsworth*, 218 A.2d 249, 256 (Pa. 1966)).

The trial court did not engage with the only basis the government ever advanced as a justification for the pocket search: that Brown consented to it. *See Brown v. United States*, 983 A.2d 1023, 1026 (D.C. 2009) ("[E]vidence obtained pursuant to a consent search may be admitted under a well-recognized exception to the Fourth Amendment exclusionary rule."). Brown argued that he did not consent, and the trial court bypassed the question after apparently concluding that it was irrelevant because the same suspicion that justified the first pat-down likewise justified the second pat-down, irrespective of the pocket search. In our view, that was a mistake.

We cannot simply bypass the legality of the pocket search because it appears to be a step in the causal chain that led to Brown's gun being discovered. It was during the pocket search that Officer Jones felt a gun in Brown's groin area, which led immediately to the second pat-down in the precise area where Officer Jones had felt a gun. As the trial court put it, "[i]t was not until officers went into the defendant's pocket for his ID that Officer Jones felt the slide of the gun," and "[t]he second pat-down was directly in the location where the gun had been felt." So Brown has at least made a "prima facie showing" that the pocket search had a "causal connection to the alleged fruit," i.e., the gun, and if Brown indeed did not consent to that search then it was unconstitutional and "the burden of producing evidence that will bring the case within [an] exception[] to the exclusionary rule . . . rests squarely upon the prosecution."[2] *Crews v. United States*, 389 A.2d 277, 289 (D.C. 1978) (en banc), *rev'd on other grounds*, 445 U.S. 463 (1980).

The government did not make any argument before the trial court or in its appellate briefing that any exception to the exclusionary rule applied on these facts

---

[2] The government initially resisted that conclusion in its brief, arguing that "the propriety of the second pat-down does not depend on the fact that Officer Jones felt a gun while retrieving Brown's identification." But when pressed at oral argument, the government abandoned that position and acknowledged that the legality of the pocket search impacts the legality of the second pat-down search.

if the pocket search was unconsented to. At oral argument, the government argued it should be permitted to make such an argument if we remand on the question of consent, suggesting that the record could support a finding that the gun was admissible under the "independent source" exception to the exclusionary rule. *See Utah v. Strieff*, 579 U.S. 232, 238 (2016) ("[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source."). It is unclear what evidence the government believes could support a finding that Officer Jones would have conducted the second pat-down had he not felt the gun during the pocket search, or put another way, what evidence could support a ruling that the gun was "obtained independently from activities untainted by the initial illegality." *Murray v. United States*, 487 U.S. 533, 537 (1988).

That uncertainty aside, the government "had a full opportunity" to advance this argument at the suppression hearing but failed to do so, so we see no reason it should be given a "second bite at the apple" to press it on remand. *Evans v. United States*, 122 A.3d 876, 885 (D.C. 2015) (declining to remand for consideration of "independent source" argument that the government raised "for the first time at [the appellate] oral argument"). Whether the independent source doctrine applies depends on factual questions that the parties had no reason to create a record on at

the suppression hearing given that the government was not pressing an independent source argument at the time. So to remand on that issue would either create procedural unfairness to the defense—which previously had no reason to develop a record on the independent source question—or would require reopening the suppression record for further factual development, which we are generally reticent to direct and the government does not actually request. *Id.* If the pocket search was illegal then the government has simply not carried its "burden to show that the initial illegality" of that pocket search "did not taint its subsequent discoveries" during the second pat-down, *Smith v. United States*, 283 A.3d 88, 98 (D.C. 2022), and we see no cause to remand on that question.

For his part, Brown argues that we should not remand on the question of consent but instead should reverse his convictions outright because (1) the government did not argue before the trial court that Brown consented to the pocket search, and (2) the trial court already rejected the argument that Brown consented to that search. We disagree on both fronts.

First, the government clearly argued in its written opposition to the suppression motion that Brown consented to the pocket search. It is true, as Brown points out, that the government did not "argue consent in the suppression hearing" itself, but preservation does not require parties "to press their positions until blue in

the face." *Evans v. United States*, 304 A.3d 211, 222 (D.C. 2023). Rather, "issues are preserved so long as the trial court was 'on notice that [the party's] position on the correct rule of law differed from the court's.'" *Id.* (quoting *Wilson-Bey v. United States*, 903 A.2d 818, 828 (D.C. 2006) (en banc)). The government had already clearly argued in its written pleadings that Brown consented to the pocket search, and what's more, the trial court demonstrated that it was aware of that argument when it indicated that it was not going to rely on any purported consent in its suppression ruling. The government therefore adequately preserved its argument that Brown consented to the pocket search.

Second, Brown argues that the trial court already ruled that he did not consent to the pocket search, but that overstates the matter. What the trial court said was that it was "not going to be finding that [Brown] consented for Fourth Amendment purposes" and was "not basing any decision . . . on consent." We do not understand that to be a finding that Brown did not consent to the pocket search, but instead as the trial court reserving judgment on that question, based on its reasoning that it did not matter to the ultimate question of suppression.

While we disagree with that reasoning and conclude that whether Brown consented to the pocket search is pivotal to resolving the suppression question before us, the question of consent is best left to the trial court in the first instance. *See Maye*

*v. United States*, 260 A.3d 638, 650-51 (D.C. 2021) (remanding for further factual findings regarding whether defendant freely and voluntarily consented to search). That is because "the voluntariness of a consent to search is 'a question of fact to be determined from all the circumstances,'" *In re J.M.*, 619 A.2d 497, 500 (D.C. 1992) (en banc) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973)), and such factual determinations are much more in the trial court's wheelhouse than in ours. We thus remand to the trial court to determine whether Brown consented to the pocket search.

## C. The Second Pat-Down

As we have explained above, the legality of the second pat-down depends on whether Brown consented to the pocket search. If he gave his "free and voluntary consent" to the pocket search, then it was constitutional. *Ford v. United States*, 245 A.3d 977, 983 (D.C. 2021). And because Officer Jones's credited testimony was that he felt what appeared to be a gun during that search, that provided (at least) reasonable articulable suspicion to pat Brown down a second time. That is true even if we assume that reasonable articulable suspicion to search had dissipated by virtue of the first pat-down, because just as suspicion can dissipate, it can also be renewed by the discovery of new information, like feeling a gun. *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993) ("[T]he mere fact that the officers' original ground for

stopping [the suspects] dissipated does not prevent them from continuing their investigative stop based on new facts creating a reasonable articulable suspicion of criminal activity.").

But if Brown did not freely and voluntarily consent to the pocket search, then the discovery of the gun during the second pat-down was a fruit of the illegal pocket search so it must be suppressed.[3] *See generally Wilson v. United States*, 102 A.3d 751, 753 (D.C. 2014) (suppression required where "the evidence in question 'has been come at by exploitation of the primary illegality [rather than] by means sufficiently distinguishable to be purged of the primary taint.'" (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (cleaned up))). That is true even if we conversely assume that reasonable articulable suspicion to search had *not* dissipated after the first pat-down, because the government did not show that the intervening

---

[3] As indicated in footnote 1, the trial court quite reasonably understood Brown to have conceded the point that if officers had reasonable articulable suspicion for the first pat-down, they likewise had reasonable articulable suspicion for the second pat-down. But assuming that point has been conceded, it does not obviate Brown's distinct argument that the second pat-down search was tainted by the illegal and unconsented to pocket search so that the gun should be viewed as a fruit of that search. We therefore do not think any concession as to the existence of reasonable articulable suspicion at the time of the second pat-down is material to the proper disposition of the suppression motion.

taint of the illegal pocket search had been purged under any exception to the exclusionary rule. *See supra* Part II.B.

### III. Conclusion

For the reasons above, we remand to the Superior Court to determine whether Brown freely and voluntarily consented to the pocket search. If the trial court determines that he consented to the pocket search, then it was ultimately correct to deny the suppression motion and the court should leave Brown's convictions undisturbed. But if Brown did not consent to the search of his pocket, then his suppression motion should be granted and his convictions should be vacated.

*So ordered.*