# District of Columbia
# Court of Appeals



**Nos. 15-CF-126 & 15-CF-279**

GORDON C. CARPENTER and TYRONE P. JONES,
                                        Appellants,

          v.                            **CF2-17930-13 &**
                                        **CF2-17953-13**

UNITED STATES,
                                        Appellee.


On Appeal from the Superior Court of the District of Columbia
Criminal Division

          BEFORE:  THOMPSON and EASTERLY, *Associate Judges*; and FARRELL, *Senior Judge*.

## J U D G M E N T

          This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

          ORDERED and ADJUDGED that judgments of conviction are affirmed.

                              For the Court:

                              JULIO A. CASTILLO
                              Clerk of the Court


Dated:  August 11, 2016.

Opinion by Associate Judge Phyllis D. Thompson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 15-CF-126 and 15-CF-279

GORDON C. CARPENTER and
TYRONE P. JONES, APPELLANTS,

FILED 8/11/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

V.

UNITED STATES, APPELLEE.
Appeals from the Superior Court
of the District of Columbia

(CF2-17930-13 and CF2-17953-13)

(Hon. Patricia A. Broderick, Trial Judge)

(Argued June 16, 2016                    Decided August 11, 2016)

*Marc L. Resnick* for appellant Jones.

*Abram J. Pafford* for appellant Carpenter.

*Danny Lam Nguyen*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *Nicholas P. Coleman*, and *Gilead Light*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and FARRELL, *Senior Judge*.

THOMPSON, *Associate Judge*:  On October 8, 2013, Tyrone Jones and Gordon Carpenter were arrested in connection with a narcotics buy/bust operation.

Mr. Jones filed (and Mr. Carpenter joined) a motion to suppress tangible evidence, which was denied. A jury thereafter convicted each of them of one count of unlawful distribution of a controlled substance (heroin), having heard an undercover officer testify that she gave a $20 bill to Jones, who gave the money to Carpenter, received from Carpenter in return a ziplock bag of heroin, and gave the ziplock bag to the officer. A few months after the jury verdict, but before a scheduled sentencing proceeding, the government made the following disclosure: that, near the end of trial, after hearing testimony from both Carpenter and Jones during the defense case, the courtroom clerk sent to the prosecutor an email asserting that Carpenter and Jones were "not telling the truth" when they claimed that the money Jones paid Carpenter was for losing a bet on the outcome of a professional football game the previous week. In response to that disclosure, Jones filed a motion for a mistrial, which the court denied.

In this appeal, Carpenter challenges the denial of the motion to suppress and also argues that the trial court erred in failing to strike, or to give a curative instruction with respect to, a government witness's "unfair[ly] prejudic[ial]" trial testimony regarding a concern about officer safety. Jones contends that he is

entitled to reversal of his conviction, or at least to resentencing, because of the courtroom clerk's email. For the reasons that follow, we affirm.

## I.

### A. The suppression hearing

Jones moved to suppress the evidence, including six ziplock baggies of crack cocaine, found on his person.[1] In (orally) joining Jones's motion, Carpenter did not clarify what evidence he sought suppressed, but we understand from his appellate brief that he challenged the admissibility of a prerecorded $20 bill found on his person. At the suppression hearing, the court (the Honorable Patricia A. Broderick) heard from Metropolitan Police Department ("MPD") Detective Phillip Robinson, who testified that, on October 8, 2013, MPD was conducting a buy/bust operation in the vicinity of the 600 block of Division Avenue, N.E. Detective Robinson explained that he was on the arrest team that day when undercover

---

[1] Jones was charged with unlawful possession of a controlled substance (cocaine) as well as with distribution of heroin, but the cocaine-possession charge was later dropped.

officers went into the 600 block to try to buy narcotics and were positioned near the wall of a "short" stone bridge that begins at Division Avenue and Foote Street and "then keeps going into the 600 block." Upon receiving a lookout for "two African American males" "in the 600 block of Division Avenue, around that bridge" from whom the officers had received heroin in exchange for MPD funds, Detective Robinson responded to the location, arriving in "less than a minute." According to the lookout, "[b]oth [men] had hats on, one [with] a gray hoody and white shirt and one [with] a blue hoody and a cane[.]"[2] When Detective Robinson arrived at the scene, he saw two individuals fitting the lookout description.[3] The two individuals, appellants Jones and Carpenter, were standing seven or eight feet apart from each other at, close to, or by the bridge. Detective Robinson testified that there were "[m]aybe ten other people" "[i]n the immediate area" ("but not by the bridge"),[4] but "[t]here was no one else on that bridge . . . that would fit the

---

[2] Detective Robinson later suggested that the lookout description for the man with the cane included that he was wearing a "light hat[.]"

[3] Detective Robinson testified that undercover Detective Jonathan Lewis (who testified at trial that he provided surveillance to the officers conducting the buy, watched the targets of the operation, and did not lose sight of the individuals between the time when the undercover officers left the area and when the arrest team arrived) had "stayed in the area" and "was helping with the lookout for Mr. Carpenter and Mr. Jones."

[4] Detective Robinson explained that "sometimes you have kids there" (i.e., in the park that is "on the other side of the . . . street"") and that his estimate of about ten other people included any children who were there.

description that the undercovers gave" for either individual.[5] Detective Robinson did not see Jones and Carpenter talking or otherwise communicating.

Approximately five to ten or ten to fifteen minutes after Detective Robinson had stopped appellants, the undercover officers who had conducted the transaction returned to the scene and positively identified Jones and Carpenter as the men with whom they had engaged in the narcotics transaction. After the undercover officers identified them, appellants were arrested.

Neither of the defendants presented evidence at the motion hearing. Without elaborate explanation, the judge denied the motion to suppress, finding her decision "pretty easy."

---

[5] Detective Robinson testified that a gully and a wooded area with unkempt grass and vines are below and behind the wall of the bridge.

## B. Trial

At trial, Detective Lavinia Quigley testified that, on October 8, 2013, she and Officer Courtney Clark were undercover and were standing on the corner in the 600 block of Division Avenue, N.E., when a man approached and asked them what they wanted. Detective Quigley responded that they wanted "blow[,]" a "street name for heroin." The man, whom the detective identified in court as Carpenter, told them to wait, and he walked away. Approximately a minute and a half later, another man, identified in court as Jones, approached them and asked what they were looking for, and Officer Clark responded they wanted "scramble" (heroin that has been cut up with a cutting agent). The officers walked with Jones to the nearby bridge, Detective Quigley handed Jones a prerecorded $20 bill, and Jones dropped the money off the side of the bridge to Carpenter, who the detective could see was standing in the gully about six or seven feet immediately below the bridge. Carpenter then passed up a ziplock bag containing a tannish powder.[6] After leaving the location, the detective and officer gave a prearranged signal to

---

[6] At trial, the parties stipulated that a Drug Enforcement Administration chemist would testify that the substance in the bag was heroin.

another undercover officer. After the arrest team moved in and stopped the defendants, the undercover officers returned three to four minutes later and positively identified them as those involved in the transaction.

Detective Steven Manley testified that he provided surveillance and security approximately two blocks away from the area of the "buy" operation, and once he received the lookout, he moved in "to detain the two subjects who matched the description[.]" He testified that, after the undercover officers returned and positively identified the individuals, he arrested the men, whom he identified in court as Jones and Carpenter. After arresting Carpenter, Detective Manley searched Carpenter's pockets and found the prerecorded $20 bill. Asked about whether his job was to observe the actual transaction, Detective Manley explained:

> [A]s an arrest team member, you don't want to be too close because then you're putting your undercover officer's life in danger. When you go into areas like Division Avenue, if they see something that sticks out like a sore thumb, they know you're either the police or . . . you're from not around [this] area. So the whole thing is[,] I don't want to be too close to the undercover officers, because, again, I'm putting their life in danger.

Counsel for Carpenter objected and moved to strike because "[t]here's nothing in this record that suggested anybody's life was in danger." Judge Broderick did not strike the answer but responded, "Well, there's certainly no suggestion that life was endangered by these defendants."

Both Jones and Carpenter testified during the defense case. Carpenter testified that on the day in question, he was driving home from work when he stopped at Marvin Gaye Park in the 600 block of Division Avenue, N.E., to meet friends. He further testified that about a week earlier, he and Jones, whom he knew from previous encounters at the park, had placed a bet on a football game. Specifically, Carpenter testified that Jones had bet $20 that the Washington football team would beat Carpenter's favored team,[7] but that Washington had lost the game, and so when Carpenter saw Jones on October 8 (the first time he had seen Jones since the football game), Carpenter asked Jones for the money the latter owed for losing the bet. Carpenter testified that he then walked to a nearby store where he stayed for ten to twenty minutes, walked into a gully below a bridge near the park to urinate, and then returned to Jones to get the money. Carpenter testified

---

[7] Although Carpenter could not remember which team Washington had played, he thought they had "probably play[ed] [one] of [his] teams[,]" which, he explained, were Pittsburgh, San Francisco, and Miami.

that Jones handed him $20, and, "seconds" later, the police arrived and said Carpenter was under arrest for distribution of narcotics. Carpenter denied having any narcotics in his possession at the time and denied passing any narcotics to Jones.

Jones testified that he was sitting on the bridge when he saw Carpenter, with whom he had made a $20 bet the week before. According to Jones, he had bet Carpenter that Washington would win the football game, but Carpenter won the bet, and so Jones paid him the $20. He testified that Carpenter was down behind the bridge at one point, but he denied giving any money to, or receiving anything from, Carpenter while Carpenter was there. Jones also denied being in possession of the heroin that was introduced into evidence.

After Jones's testimony, the jury was released for its lunch break at 12:50 p.m. Upon the jury's return, the prosecutor announced that the government would not need any rebuttal time, and the case proceeded to closing arguments, followed by jury instructions and deliberations.

After the jury announced its guilty verdicts, Judge Broderick commented that the defendants should "get their affairs in order because . . . [t]his is serious. They lied under oath.  At least, that's what the jury found.  I take that very seriously."  She then addressed "another option" besides releasing the defendants until the sentencing date (having already rejected the prosecutor's request that the defendants be held pending sentencing).  Recognizing that this was a felony case and that the defendants therefore would not qualify for work release after sentencing, Judge Broderick provided the defendants with the option of either earning incarceration credit while in a halfway house while awaiting sentencing (while continuing to work for as long as possible) or being released into the community.  Carpenter accepted the option of earning time in the halfway house pending sentencing, but Jones did not.

## C.  Sentencing

On December 12, 2014, when court convened for the scheduled sentencing hearing, Assistant United States Attorney ("AUSA") Gilead Light sought a

postponement,[8] which Judge Broderick granted.[9]  On January 13, 2015, the government filed a disclosure, advising the court and defense counsel about an email Light had received from the courtroom clerk on October 6, 2014, "during testimony in the defense's case-in-chief."  The courtroom clerk's email, sent at 12:30 p.m., read, "[Washington] WON that week, and they played the Oakland Raiders . . . so they are not telling the truth!!"  During proceedings on January 15, 2015, Jones's counsel, in response to the government's disclosure, sought to delay Jones's sentencing.  Counsel asserted that Jones believed that Judge Broderick became aware of the email or its contents during trial and that the result was the comment the judge made about the defendants' having "lied under oath."  Counsel also told the court that Jones wanted time to review the trial transcripts and consider moving for a mistrial.  Counsel further expressed Jones's concern that the email's content would affect his sentence.  Judge Broderick stated that the email had not been disclosed to her previously and that she "ha[d] no memory of [any

---

[8]  AUSA Light apologized and referred to "an issue that [arose] in my preparation for sentencing over the last 20 hours – 24 hours[,]" about which he said he "ha[d] not yet had sufficient time to consult with the people [he] need[ed] to consult with to decide how best to move forward[.]"

[9]  Because sentencing was postponed and the judge "d[idn't] want [Carpenter] serving any extra time" in the halfway house, she decided to release Carpenter.

remark] at all[,]" but allowed the matter to be continued "so that [Jones] feels that he's getting his shot" at reviewing the email issue.

Carpenter proceeded with sentencing on January 15, 2015; Judge Broderick sentenced him to fifteen months' incarceration and three years' supervised release, execution of sentence suspended as to all except served (the two months Carpenter had served in the halfway house) and two years' supervised probation.[10]

On March 3, 2015, Jones moved for a mistrial "based [on] . . . the courtroom clerk conduct[ing] her own investigation and shar[ing] that information with the prosecutor and judge in this case." Judge Broderick denied the motion for a mistrial, stating, "[t]here's just no evidence that any of this information, . . . which was public information . . . [that] anyone could've gotten[,] . . . ever got to the jury" and observing that Jones therefore had no "basis to show any prejudice[.]"

---

[10] The government had sought eighteen months' incarceration, execution of sentence suspended as to all but four months in prison, followed by two years' probation with implementation of an intervention plan. According to the prosecutor, Carpenter had two prior misdemeanor convictions and nine arrests "for a variety of burglaries, thefts and unauthorized use of vehicles, purse snatches[,] and drug related offenses."

Judge Broderick further stated, "it's information that . . . I'm allowed to use for sentencing, but . . . I quite frankly don't need to [use] because the jury rendered its verdict after hearing the defendant[,] [a]nd that's where I get my basis for believing that the jury didn't believe him."

Judge Broderick reminded Jones that, after the verdicts had been rendered, she had given both defendants the option of getting credit for time served by staying in a halfway house pending sentencing or doing straight time after sentencing, and that Carpenter chose a halfway house while Jones chose to remain in the community and accept the potential of doing straight time. Before announcing Jones's sentence, Judge Broderick commented that she "want[ed] to be fair to both [Carpenter and Jones]" in her ruling.[11] She sentenced Jones to twenty

---

[11] The judge also observed that because of Jones's criminal history (according to the prosecutor, eleven prior convictions, including for drug offenses, unauthorized use of a vehicle, and larceny, and thirty-three prior arrests), the sentencing guidelines indicate a range of twenty to forty-two months and made Jones's "not a straight probation case." She remarked that she was "a little restricted" in what she could do in terms of sentencing.

months' incarceration and three years' supervised release, suspended to all but six months in prison, and eighteen months' supervised probation.[12]

## II.

### A. Carpenter's appeal
### 1. The motion to suppress

Contending that his arrest was not supported by probable cause, Carpenter argues that Judge Broderick erred in denying his motion to suppress the prerecorded $20 bill recovered during the search incident to arrest. Specifically, he claims that the "lookout was too generic on its face to support a finding of probable cause" and that the overall number of people in the arrest area "diluted" "[a]ny limited value ascribed to" the description. Although Carpenter's opening brief

---

[12] The government had sought twenty-four months' imprisonment to be followed by supervised release, and the defense sought "a split sentence with minimal jail time and a lengthy period of probation." ("A 'short split' sentence is one in which the court imposes a prison sentence that falls within the guideline range for prison time, but 'suspend[s] execution of all but six months or less — but not all — of that sentence, and impose[s] up to 5 years [of] probation.'" (*D'Angelo*) *Johnson v. United States*, 30 A.3d 783, 785 n.3 (D.C. 2011) (quoting District of Columbia Voluntary Sentencing Guidelines Manual (2008) at 3-3 to 3-4).) The prosecutor noted (and Jones did not dispute) that Jones's criminal history resulted in a sentencing guidelines range of twenty to forty-two months.

states the issue as whether there was probable cause for his arrest, the facts upon which he relies (the generality of the lookout and the activity at the scene) relate instead (as appellant's Reply Brief appears to recognize) to whether the arrest team officers were justified in stopping him.

A stop based on an undercover officer's lookout description is "not an arrest, but rather a brief detention designed to give the undercover officer an opportunity to advise the arrest team if they had apprehended the perpetrators." *King v. United States*, 550 A.2d 348, 357 (D.C. 1988).[13] "The Fourth Amendment permits a police officer to stop an individual for investigatory purposes so long as the officer possesses a reasonable suspicion supported by 'specific and articulable facts' that the individual is involved in criminal activity." *Milline v. United States*, 856 A.2d 616, 619 (D.C. 2004) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "An investigatory detention is constitutionally permissible if it is supported by reasonable suspicion, which is 'a particularized and objective basis' for suspecting

_____

[13]     We reject Carpenter's claim that that the stop turned into an arrest because he was detained "for as long as fifteen minutes" before the undercover officers returned to identify him. *See Hicks v. United States*, 730 A.2d 657, 660 (D.C. 1999) (holding that where "[t]he total time of detention," which included transporting the victim to an on-scene identification procedure, was "not more than twenty-five minutes[,]" the detention did not "exceed the limits of a lawful *Terry* detention").

the detained person of criminal activity." *Sharp v. United States*, 132 A.3d 161, 169 (D.C. 2016) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

"Our review of a trial court's denial of a motion to suppress is limited." *Joseph v. United States*, 926 A.2d 1156, 1160 (D.C. 2007). "[T]he facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court's ruling." *Howard v. United States*, 929 A.2d 839, 844 (D.C. 2006) (alteration omitted). "The court's legal conclusions on Fourth Amendment issues, however, are subject to de novo review." *Joseph*, 926 A.2d at 1160 (internal quotation marks omitted).

The evidence at the suppression hearing was that Detective Robinson received a lookout for two individuals from whom the undercover officers had purchased narcotics near the bridge in the 600 block of Division Avenue, specifically, "two African American males[,] [b]oth had hats on, one had a gray hoody and white shirt and [the other] had a blue hoody and a cane[.]" Detective Robinson arrived at the scene of the stop within a minute, found appellants in the same block described in the lookout, standing about eight feet apart from each other on the bridge, and saw no individuals near the bridge other than appellants

who matched the lookout description. Thus, there was the "close spatial and temporal proximity between the reported crime and seizure" that can justify a *Terry* stop notwithstanding an "imperfect description." *United States v. Turner*, 699 A.2d 1125, 1129 (D.C. 1997); *cf. In re T.L.L.*, 729 A.2d 334, 340-41 (D.C. 1999) ("The generality of the descriptions of the robbers might not have been fatal if the accused had been apprehended immediately after the robbery at the location where the crime occurred.").

Further, although Detective Robinson's description of the role that undercover surveillance Detective Lewis played was not crystal clear, Detective Robinson testified that Detective Lewis had "stayed in the area" and "was helping with the lookout for Mr. Carpenter and Mr. Jones." That testimony and "all reasonable inferences therefrom[,]" viewed in the light most favorable to the government as the party that prevailed on the suppression motion, *Pridgen v. United States*, 134 A.3d 297, 302 (D.C. 2016), are additional support for a conclusion that the detectives who stopped Jones and Carpenter had particularized suspicion that they were involved in the narcotics transaction. Moreover, although Carpenter emphasizes that the officers approached him "in the midst of a busy street scene" and failed to pay attention to other people who were in the park,

Detective Robinson explained that the park is on the other side of the street, that some of the people who frequent the park are children (who, it seems, could readily have been eliminated from suspicion) and that Jones — who was standing near Carpenter — had a cane and a blue hoody and a light hat that "you can't really miss[.]"  Considering that "[t]he reasonable suspicion standard . . . requires substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence[,]" *Henson v. United States*, 55 A.3d 859, 867 (D.C. 2012) (internal quotation marks omitted), we are satisfied that the officers had sufficient justification for stopping Carpenter (and Jones).[14]

For the foregoing reasons, we discern no error in the trial court's denial of the motion to suppress the tangible evidence.  In addition, after Detective Quigley and Officer Clark returned to the area and positively identified Carpenter and Jones

---

[14]  *See Milline*, 856 A.2d at 620 ("Given (1) the exactitude with which the lookout specified the subjects' location, (2) the proximity in time between the lookout and the stop, (3) the particularity and unquestioned accuracy of the description of Hawkins, (4) Milline's association on the scene with Hawkins, (5) Officer Farmer's perception, which is uncontradicted, that Milline's appearance fit the lookout description of the second suspect (whatever it was), and (6) the absence of other people in the immediate vicinity who also matched the lookout, we have no difficulty concluding as a matter of law that Officer Farmer was justified in effecting an investigatory stop of Milline as well as of Hawkins.").

as the individuals involved in the drug transaction, probable cause existed to arrest and search both men.[15]

### 2. The assertedly prejudicial testimony

Carpenter also argues that the trial judge should have stricken (or provided a curative instruction with respect to) Detective Manley's testimony that, as a member of the arrest team, he "d[idn't] want to be too close [to the undercover officers] because . . . [he would be] putting [their] li[ves] in danger." Carpenter argues this testimony was "irrelevant and unfairly prejudicial" because it suggested that the officers "faced life-threatening danger in connection with the alleged narcotics transaction[.]"

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Plummer v. United States*, 813 A.2d 182,188 (D.C. 2002). Here, Judge Broderick seemingly agreed that Detective

---

[15] *Id.*

Manley's comment about putting the officers' lives in danger was irrelevant, but she did not strike this testimony. It would have been preferable for the court to do so. However, in light of the facts that Judge Broderick at least signaled to the jury that this testimony had no bearing on Carpenter's trial;[16] that the government did not highlight this testimony in closing; and that the evidence establishing Carpenter's guilt was otherwise strong, we conclude that the court's failure to take this step was harmless error. *See Ebron v. United States*, 838 A.2d 1140, 1150 (D.C. 2003) (assessing whether admission of irrelevant threats evidence was harmless error by considering "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error") (internal quotation marks omitted).

### B. Jones's appeal

Jones's issues on appeal relate to the courtroom clerk's email. Jones first argues that Judge Broderick abused her discretion in denying his motion for a mistrial because the email amounted to (or occasioned) a violation of the Code of Judicial Conduct (2012) ("Code") prohibition against ex parte communications. Jones cites Rule 2.9 (A) of the Code ("A judge shall not initiate, permit, or

---

[16] During his objection, Carpenter's attorney also remarked in the presence of the jury that "[t]here's nothing in this record that suggested anybody's life was in danger."

consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter[.]").

A clear implication of the Rule 2.9 (A) prohibition against a judge's "permit[ting]" ex parte communications is that a judge should caution her staff against seeking out extraneous information concerning a pending matter or conveying such information to the judge, a party, or counsel. That obligation is made explicit in Rule 2.9 (D), which provides that "[a] judge shall make reasonable efforts, including providing appropriate supervision, to ensure that [the Rule against ex parte communications] is not violated by court staff, court officials, and others subject to the judge's direction and control."[17]

---

[17] Rules 2.9 (A)(3) and 2.9 (C) may also be implicated. Rule 2.9 (A)(3) provides: "A judge may consult with court staff and court officials whose functions are to aid the judge in carrying out the judge's adjudicative responsibilities, or with other judges, provided the judge makes reasonable efforts to avoid receiving factual information that is not part of the record, and does not abrogate the responsibility personally to decide the matter." Rule 2.9 (C) provides: "A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." *See also* Rule 2.9 cmt. 6 ("The prohibition against a judge investigating the facts in a matter extends to information available in all mediums, including on-line databases and the Internet generally."); *Davis v. United States*, 567 A.2d 36, 39, 41 (D.C. 1989) (error for judge to "undertak[e] an off-the-record investigation to

(continued…)

Although it clearly was improper for the courtroom clerk to send the email to the prosecutor, the record does not establish that Judge Broderick failed to caution her staff or to make the requisite "reasonable efforts."[18] The record also does not establish that Judge Broderick learned of the courtroom clerk's email or its contents before the government's January 2015, disclosure.[19] What is clear is that the judge learned of the email and its contents before she sentenced Jones. However, even taking into account that fact and, further, assuming *arguendo* that the judge did learn of the email's contents before the government's disclosure, we

---

(…continued)

check appellant's veracity" and "it is primarily the task of counsel, not the court, to develop the facts essential to the jurors' understanding of the case").

[18] The timing of the government's disclosure of the email, however, is troubling: had the government disclosed it earlier, Judge Broderick would have been alerted in a more timely fashion to the need to instruct and admonish her courtroom clerk (and perhaps other members of her staff).

[19] Jones argues that there would have been "no firm basis" for the judge's post-verdict remarks about defendants' having "lied" unless the judge had taken into account the courtroom clerk's email. However, Judge Broderick stated that she "g[ot] [her] basis for believing that the jury didn't believe [the defendants]" from the verdict the jury rendered after hearing the defendants' testimony. She explained that the defendants "lied under oath. At least, that's what the jury found." "We have no reason to reject [her] explanation." *Belton v. United States*, 581 A.2d 1205, 1214 (D.C. 1990); *cf. Sloan v. United States*, 527 A.2d 1277, 1287 (D.C. 1987) (accepting the trial court's statement, made "explicitly on three occasions[,]" that an ex parte communication between a juror and the judge's law clerk after the jury verdict but before sentencing "was not a factor in his sentencing determination").

conclude for the reasons discussed below that Jones is not entitled to the relief he seeks — reversal of his conviction or resentencing.

Jones does not claim that the email impacted jury deliberations; he acknowledged in his motion for mistrial that the prosecutor, "Mr. Light[,] did not take any action based upon [the courtroom clerk's] information[,]" and he states in his appellate brief that "the issue was not, and is not, whether . . . Jones was prejudiced during jury deliberations[.]"[20] Jones's contention is rather that he was prejudiced during sentencing. We are unpersuaded by his argument, because the sentence Judge Broderick imposed belies the claim of prejudice. The sentence imposed — twenty months' incarceration and three years' supervised release,

---

[20] The record supports that concession. The courtroom clerk's email was sent during Jones's testimony. In cross-examining Jones, the prosecutor asked no question about the putative bet on a football game or the outcome of the game, and the government presented no rebuttal. And, during closing arguments, the prosecutor referred to the testimony about the claimed bet only by saying that it did "not matter" because Carpenter had more than one $20 bill on him.

Accordingly, Judge Broderick did not abuse her discretion in denying the motion for a mistrial. *See Harrison v. United States*, 76 A.3d 826, 839 (D.C. 2013) ("Absent a showing by appellant[] that [the] severe remedy was mandated, we cannot find that the trial court abused its discretion in denying appellant['s] motion for a mistrial."); *Evans v. United States*, 12 A.3d 1, 7 (D.C. 2011) ("We will reverse a trial court's denial of a mistrial only where it appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice.") (internal quotation marks omitted).

suspended as to all but six months' incarceration and eighteen months' probation — was on the very low end of the applicable guidelines range (twenty to forty-two months) for someone with Jones's criminal history of eleven prior convictions. Moreover, the sentence was consistent with Jones's counsel's request for a split sentence with minimal jail time and lengthy probation, and was significantly less than the government's requested twenty-four months' straight time. These facts weigh strongly in favor of a conclusion of no substantial prejudice. *Cf. Gregg v. United States*, 394 U.S. 489, 493-94 (1969) (no prejudice shown from information received by judge because the judge had no discretion in sentencing); *Reel v. State*, 886 S.W.2d 615, 618 (Ark. 1994) (judge's decision that sentences were to be served concurrently "suggests leniency" and gave no indication of compromised impartiality).[21]

Jones alternatively claims that Judge Broderick displayed "apparent partiality" before and during sentencing, and, pursuant to Rule 2.11, should have

---

[21] Jones also complains that he had no opportunity to rebut the information in the email, but we reject that claim. The government disclosed the email to the defense through a January 13, 2015, filing, and Jones did not file his motion for a mistrial until March 3, 2015, meaning that he had time to challenge the information in the email if he cared to do so.

recused herself for the sentencing phase.[22]  Rule 2.11 (A) provides that "[a] judge shall disqualify . . . herself in any proceeding in which the judge's impartiality might reasonably be questioned," and it requires recusal in "any case where there is an appearance of bias or prejudice sufficient to permit the average citizen reasonably to question the judge's impartiality." *Anderson v. United States*, 754 A.2d 920, 923 (D.C. 2000) (brackets omitted and emphasis omitted).  Rule 2.11 (A)(1) specifically explains that a judge shall disqualify herself where "[t]he judge has . . . personal knowledge of facts that are in dispute in the proceeding."

This court repeatedly has recognized that "justice must satisfy the appearance of justice[,]" *Foster v. United States*, 615 A.2d 213, 219 (D.C. 1992) (quoting *Belton*, 581 A.2d at 1214), and that we must consider both "the risk that the denial of relief [where there was an appearance of partiality] will produce injustice in other cases, and the risk of undermining the public's confidence in the

---

[22]  The government argues that because Jones did not request Judge Broderick recuse herself, he failed to preserve this claim.  Yet, as we have explained, it sometimes "would be expecting too much to hold a defendant accountable for failing, in effect, to accuse a judge of bias at the hearing just before the discretionary, virtually non-reviewable act of sentencing takes place[,]" and "a judge should know the ethical restraints on the judicial office; a defendant should not be penalized on appellate review for failure to point out to a judge the ethical rules which the judge should know without coaching." *Belton*, 581 A.2d at 1212.  We elect to consider Jones's claim under "the standard of review available to any criminal defendant who has made a timely request for relief." *Id.* at 1212-13.

judicial process[,]" *id.* at 220 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)). For that reason, we have reversed convictions or vacated sentences in cases where an observer would have reasonably questioned the trial judge's impartiality. *See, e.g.*, *Turman v. United States*, 555 A.2d 1037, 1039 (D.C. 1989) ("To announce to the parties that the court had previously gained a good impression of a witness' credibility, and then to proceed to weigh that witness' credibility in the case at bar *without assuring the parties that the previous assessment would play no role in judging the pending case*, created an appearance of partiality, if not an implication of actual partiality, which tainted the trial process.") (emphasis added); *Belton*, 581 A.2d at 1214-15 (remanding the case for resentencing of defendant Cowan by a different judge because "a hypothetical objective observer who heard Judge Walton say at the sentencing hearing that he had been 'talking to some women who live out in Mayfair Manor,' who 'know' James Cowan, and who said that James Cowan 'was making their li[ves] miserable[,]' . . . would know that Cowan had heard about these women for the first time at the sentencing hearing and had had no opportunity to pursue the accuracy of what the judge had reported[,]" "would not have heard anything about whether the judge was or was not going to use that information in his sentencing decision[,]" and "would have reasonably believed Judge Walton considered the *ex parte* communication in Cowan's sentencing").

Here, by contrast, we are satisfied that the record provided no basis for a hypothetical objective observer to question Judge Broderick's impartiality post-email disclosure and prior to sentencing.[23] Listening to the judge's comment ("it's information that[] . . . I'm allowed to use for sentencing, but . . . I quite frankly don't need to"[24]) the hypothetical objective observer (unlike the observer in *Belton*) would have heard that the judge was not going to use the contents of the email in her sentencing decision. Unlike in *Turman*, 555 A.2d at 1039, the judge's comment would have conveyed to the observer assurance that the email and its contents would play no role in the court's sentencing decision. Further, even after disclosure of the email, Judge Broderick was solicitous toward Jones, allowing him

---

[23]  "Any problem of appearances — by definition — must be considered by reference to the way events actually appeared [prior to sentencing]," not to the way the situation now appears, post-sentencing. *Belton*, 581 A.2d at 1214.

[24]  Judge Broderick appears to have correctly understood that "[a] defendant's truthfulness or mendacity while testifying on his own behalf, almost without exception, has been deemed probative of his attitudes toward society and prospects for rehabilitation and hence relevant to sentencing." *United States v. Grayson*, 438 U.S. 41, 50 (U.S. 1978). As *Belton* makes clear, however, a court is *not* permitted to use extra-judicial information — such as that contained in the courtroom clerk's email — for sentencing purposes. *See* 581 A.2d at 1215; *see also Foster*, 615 A.2d at 217-18, 221 (same). Thus, the judge's contrary understanding of what, hypothetically, she could "use for sentencing" was mistaken.

the option of being released into the community to continue working or earning incarceration time pending sentencing.

We are therefore satisfied that there was no actual or apparent partiality that required the judge to recuse herself from sentencing or that requires a new trial or resentencing.

## III.

For the foregoing reasons, the judgments of conviction are hereby

*Affirmed.*