*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CF-0887

NIKKO L. DRAKE, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2020-CF3-001170)

(Hon. Maribeth Raffinan, Trial Judge)

(Argued January 4, 2024                    Decided May 30, 2024)

*Michael Madden* for appellant.

*Chimnomnso N. Kalu*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *John P. Mannarino*, and *Paul V. Courtney*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and SHANKER, *Associate Judges*, and GLICKMAN, *Senior Judge*.

SHANKER, *Associate Judge*: Following a jury trial, appellant Nikko L. Drake was convicted of aggravated assault while armed and multiple firearms offenses in connection with a shooting in 2020 outside of a nightclub in Washington, D.C. Mr. Drake appeals, arguing that (1) the trial court erred in denying his motion to

suppress items, including a cell phone, officers seized when Mr. Drake was in the emergency room after the incident and (2) the trial court abused its discretion in admitting at trial text messages and a photograph showing that, four months before the shooting, Mr. Drake had arranged to purchase a handgun similar to the one used in the shooting. We disagree on both fronts and affirm Mr. Drake's convictions.

## I. Background

### A. The Shooting

The evidence at trial was as follows. On the evening of January 23, 2020, Fredirickia Lloyd went with a friend to Mirror Lounge in northwest D.C. Ms. Lloyd spent some time in the "VIP" section of the lounge with an individual named Kelvin Harris. At some point, Mr. Harris argued with a man who was described as Black, about 5'3" tall, with waist-length dreadlocks. Mr. Harris thought that the man was reaching for a weapon because he could not see the man's hand for a moment, so Mr. Harris punched the man. Security then separated the two.

Before leaving through the back door, Mr. Harris told the manager that the man was carrying a gun. The man was escorted out of the front door, but, because he had left his glasses inside, he tried to follow security back inside. As the man attempted to reenter the lounge, James Coleman, the head of security, heard from

someone that the man might be armed. The man was offered free drinks in exchange for consenting to a pat-down search, but he refused and left the club again. The individual was wearing a camouflage jacket when he left.

A short time later, Ms. Lloyd also left Mirror Lounge through the front door. She recognized the individual who had fought with Mr. Harris, approached him, and told him that she did not want to be involved in his quarrel with Mr. Harris. The man told Ms. Lloyd, "[O]h, you don't want no smoke." Ms. Lloyd took the comment as a threat and the conversation escalated. The man then punched Ms. Lloyd and she fell to the ground. A security guard known as "Fat Joe" attempted to separate the man and Ms. Lloyd. During this altercation, Mr. Coleman saw a "dull black" or "plastic dark gray" gun, warned Fat Joe about it, and told Fat Joe and other bystanders to go into the club for safety. At 11:25 p.m., two gunshots were fired. Surveillance footage showed people rushing into Mirror Lounge at that time.

Metropolitan Police Department ("MPD") Officer Michael Webber was about one block away responding to an unrelated incident when he heard two gunshots. Officer Webber immediately searched for victims and found Ms. Lloyd on the sidewalk suffering from gunshot wounds. A crime scene forensic scientist recovered a projectile and two nine-millimeter shell casings from the same area.

Ms. Lloyd was taken to the hospital, where doctors determined that she had suffered gunshot wounds to her lower abdomen and back and was in shock due to blood loss. A trauma surgeon performed an exploratory laparotomy to repair Ms. Lloyd's injuries. The surgeon testified that Ms. Lloyd could have died without the surgery.

Minutes after officers arrived at the scene outside Mirror Lounge, a lookout describing the shooter as "a black male with long dreads" was broadcast over police radio. MPD Officer Jermaine Perez spotted an individual who matched the lookout limping out of an alley around the corner from Mirror Lounge; the man was wearing a camouflage jacket. Officer Perez did not see anyone else in the area who matched the lookout. The officer noticed the man because he was limping and, in the officer's experience "with calls like this, individuals shooting at each other or possibly shooting themselves in a shoot-out, they are limping." Officer Perez followed the man to the Howard University Hospital emergency room, where the man went into a bathroom. While the man was in the bathroom, the lookout was updated to include a camouflage jacket.

**B.      The Seizure of Mr. Drake's Items**

Additional officers arrived at the hospital and, after the man came out of the bathroom, handcuffed the man, who identified himself as Mr. Drake. Officer Brian

O'Shea noticed blood on Mr. Drake's clothing. The officers decided to take Mr. Drake to a transport vehicle to continue their investigation. The officers tried to walk Mr. Drake outside, but he was unable to walk on his own, had to be carried, and eventually became limp. The officers took Mr. Drake back into the emergency room, where doctors discovered a gunshot wound in Mr. Drake's foot.

While Mr. Drake was being treated for his injury, Officer O'Shea returned to the area of the shooting and looked for surveillance footage. He reviewed footage from an establishment across the street from Mirror Lounge called Right Spot. The footage showed a man at the crime scene moments after Ms. Lloyd was shot. Officer O'Shea was "110 percent" confident that the man in the surveillance footage was Mr. Drake.

After Officer O'Shea relayed to the officers at the hospital his confidence that he had seen Mr. Drake on the surveillance footage, officers at the hospital seized Mr. Drake's clothing, shoes, and an iPhone from his coat pocket and arrested Mr. Drake. The government later accessed the contents of Mr. Drake's iPhone pursuant to a search warrant.

Police and K-9 units searched Mr. Drake's flight path for a gun but did not find one.

## C.    The Motion to Suppress

Mr. Drake was charged with multiple offenses related to the shooting.  Before trial, he moved to suppress the items that were seized in the hospital, arguing that officers unlawfully arrested him without probable cause when they stopped him as he exited the restroom because (1) they handcuffed him, (2) they commanded him to stop moving, (3) they asked whether he had a gun, and (4) one officer said over the radio that police had "one in custody."

The evidence at the suppression hearing was as follows.  Officer O'Shea testified that around 11:25 p.m. on January 23, 2020, Officer Webber and another officer were near the 1900 block of 9th Street, NW, when they heard gunshots.  The two officers found a woman on the sidewalk in front of Mirror Lounge who had been shot.  Officer O'Shea, who was patrolling in a police cruiser, arrived about one minute later.  About three minutes after the gunshots, at 11:28 p.m., one of the officers on the scene broadcast a lookout for "an African American male with dread locks."  Officer Jermaine Perez, who was patrolling in another police cruiser, saw a man matching the lookout walking out of an alley one block south and one block east of Mirror Lounge.  The individual was wearing a camouflage "bubble" jacket. Officer Perez followed the man in his car and, at around 11:36 p.m., the man walked into the emergency room at Howard University Hospital.  At about 11:38 p.m.,

police broadcast an updated lookout stating that the suspect was wearing a camouflage bubble jacket. Officer Perez requested backup over the radio.

Officer O'Shea arrived at the hospital at about 11:39 p.m. The individual Officer Perez had been following came out of a bathroom and police handcuffed him around 11:41 p.m. The man, who had blood on his clothing, identified himself as Mr. Drake.

Rather than continuing their investigation from the public emergency room, police decided to take Mr. Drake to a transport vehicle. As police began escorting Mr. Drake from the hospital, he became limp. Officer O'Shea also noticed more blood and began to suspect that Mr. Drake might be injured. Police checked Mr. Drake for a gunshot wound but did not find one; they then took Mr. Drake back into the emergency room. Once inside, police learned that Mr. Drake had been shot in the foot.

Some of the officers remained with Mr. Drake while Officer O'Shea left the hospital and went back to the 1900 block of 9th Street. There, Officer O'Shea learned that surveillance footage from Right Spot had captured a portion of the incident and showed the suspected shooter leaving the scene. After watching the footage, Officer O'Shea told the officers who were still at the hospital with Mr. Drake that he was "110 percent" sure that the suspect in the footage was

Mr. Drake. The officers at the hospital then decided to collect Mr. Drake's property. Shortly thereafter, at 12:15 a.m. on January 24, police began seizing Mr. Drake's property. Mr. Drake was formally arrested at 12:30 a.m.

The trial court orally denied Mr. Drake's motion to suppress. The court concluded that the police had reasonable, articulable suspicion to stop Mr. Drake at the hospital in light of the fact that, before they stopped Mr. Drake, they were given a lookout for a Black male with dreadlocks in a camouflage bubble jacket and Mr. Drake matched that lookout. The trial court also concluded that the officers lawfully patted Mr. Drake down because they had reason to believe that the person who had committed the shooting was armed.

The trial court further determined that police had probable cause to subsequently arrest Mr. Drake because he matched the lookout, police had surveillance footage implicating Mr. Drake in the shooting, and Mr. Drake had a gunshot wound to his foot. The court noted that officers did not seize anything from Mr. Drake until after they had learned about the surveillance footage. The trial court stated that "it was only after the officers had developed probable cause that the officers then searched and seized Mr. Drake's property" and that, given the timing

of the search of Mr. Drake's property, it "would also qualify as a search incident to arrest."[1]

### D. The Trial

In addition to the evidence recounted above relating to the events of January 23-24, at trial the government presented evidence gleaned from Mr. Drake's items. The government presented evidence that the iPhone seized from Mr. Drake's coat pocket was "somewhere in the general geographic area of 1920 9th Street, Northwest" between 11:27 p.m. and 11:40 p.m. on the night at issue, and that the phone had placed or received eight phone calls to or from the same phone number within that same time frame.

Among the data extracted from the iPhone was a September 16, 2019, text message exchange in which the iPhone user arranged to purchase a handgun, stating, among other things, "Tell em I want it," "I want da 9," and "Send address." A photograph of a black pistol with the word "Taurus" visible on the slide was included among the text messages. An expert forensic firearms examiner examined the nine-millimeter casings that were recovered from the crime scene. He also examined the September 16, 2019, photograph of a black gun. The expert concluded that (1) the

---

[1] The trial court stated that it would issue a "more comprehensive ruling on the record at a later time," but it does not appear to have done so.

two casings had been fired from the same gun, (2) the gun depicted in the photograph was consistent with a Taurus G2c semiautomatic pistol, and (3) the cartridges could have been fired by that same type of pistol. He acknowledged that the casings could also have been fired from several other types of guns.

A DNA expert recovered DNA samples from Mr. Drake's sweatpants and sneakers, which had also tested presumptively positive for the presence of blood. The DNA profile obtained from Mr. Drake's sweatpants was consistent with a mixture of two individuals, and the profile was "at least 129 octillion times more likely to be observed if it originated from Fredirickia Lloyd and Nikko Drake than if from Nikko Drake and one unknown, unrelated individual." The DNA profile from Mr. Drake's sneakers was consistent with a mixture from two individuals, including one male contributor. The DNA profile from the sneakers was "at least 45.4 octillion times more likely to be observed if it originated from Fredirickia Lloyd and one unknown, unrelated individual than if from two, unknown, unrelated individuals."[2]

The jury found Mr. Drake guilty of (1) aggravated assault while armed, in violation of D.C. Code §§ 22-401.01, -4502; (2) possession of a firearm during a

---

[2] The defense sought the admission of two exhibits used during cross-examination of the government's witnesses, but presented no additional evidence or testimony.

crime of violence, in violation D.C. Code § 22-4504(b); (3) unlawful possession of a firearm (prior conviction), in violation of D.C. Code § 22-4503(a)(1), (b)(1); (4) possession of an unregistered firearm, in violation of D.C. Code § 7-2502.01(a); and (5) unlawful possession of ammunition, in violation of D.C. Code § 7-2506.01(a)(3).[3] The trial court sentenced Mr. Drake to an aggregate term of 156 months of imprisonment to be followed by five years of supervised release.

This timely appeal followed.

## II. Analysis

Mr. Drake challenges both the denial of his motion to suppress evidence and the admission at trial of the evidence of his arrangements to purchase a gun four months before the shooting. We find neither challenge meritorious and affirm Mr. Drake's convictions.

### A. Denial of Suppression

Mr. Drake asserts that the trial court erred in denying suppression of his clothing and cell phone, which police officers seized in the hospital. We disagree.

---

[3] The jury acquitted Mr. Drake of assault with intent to kill while armed, one count of possession of a firearm during a crime of violence, and carrying a dangerous weapon.

### 1. Standard of Review

"When reviewing a trial court's ruling on a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Young v. United States*, 305 A.3d 402, 432 (D.C. 2023) (internal quotation marks omitted). "We will not disturb the trial judge's findings of fact unless they lack evidentiary support in the record." *In re Z.B.*, 131 A.3d 351, 353 (D.C. 2016) (brackets, internal quotation marks, and ellipsis omitted). We review de novo the trial court's legal determinations, including whether a stop was supported by reasonable, articulable suspicion. *Id.*; *In re J.F.S.*, 300 A.3d 748, 755 (D.C. 2023).

### 2. Discussion

The Fourth Amendment prohibits "unreasonable" searches and seizures. U.S. Const. amend. IV. Consistent with this guarantee, a police officer may conduct a brief investigatory stop of an individual if the officer is able to point to "specific and articulable facts which, taken together with rational inferences from those facts," support the conclusion that "criminal activity may be afoot[.]" *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968); *see Brown v. United States*, __ A.3d __, No. 22-CF-0520, 2024 WL 1665328, at *3 (D.C. Apr. 18, 2024). "The requirement of articulable suspicion is not an onerous one." *Jackson v. United States*, 805 A.2d 979, 988-89

(D.C. 2002) (internal quotation marks omitted). Rather, the level of suspicion necessary to support a *Terry* stop is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

"A *Terry* seizure . . . involves a more temporary detention, designed to last only until a preliminary investigation either generates probable cause or results in the release of the suspect." *In re M.E.B.*, 638 A.2d 1123, 1126 (D.C. 1993). "[A]n arrest," by contrast, "is effected when the police have made a determination to charge the suspect with a criminal offense and custody is maintained to permit the arrestee to be formally charged and brought before the court." *Id.* "[W]hen officers subject a detained suspect to a greater restraint on his liberty than is permissible in a legitimate *Terry* seizure, articulable suspicion is not sufficient, and the Constitution requires a showing of probable cause." *Womack v. United States*, 673 A.2d 603, 608 (D.C. 1996).

"The test for judging the existence of probable cause is whether a reasonably prudent police officer, considering the total circumstances confronting him and drawing from his experience, would be warranted in the belief that an offense has been or is being committed." *Ball v. United States*, 803 A.2d 971, 974 (D.C. 2002) (alterations and quotation marks omitted). Probable cause "is a flexible, common-sense standard that does not demand any showing that the officer's belief that he has

witnessed criminal behavior be correct or more likely true than false." *Id*. (internal brackets and quotation marks omitted).

Police officers may also conduct a warrantless search of a person incident to that person's arrest. *Millet v. United States*, 977 A.2d 932, 935-36 (D.C. 2009). Such a search "may precede the actual arrest if probable cause exists, independent of the search, to justify the arrest, and if the arrest follows quickly on the heels of the search." *Id.* at 935 (internal quotation marks omitted).

In arguing for suppression of his cell phone and clothing, Mr. Drake focused below and focuses now on his detention when he exited the restroom at the hospital. Mr. Drake asserts that that detention was not a brief investigatory stop that would have required only reasonable, articulable suspicion, *see Katz v. District of Columbia*, 285 A.3d 1289, 1302 (D.C. 2022), but "was effectively converted to an arrest" requiring probable cause because he was handcuffed and transported toward a police cruiser. The evidence that Mr. Drake sought to suppress was not seized during this first detention, but the detention's legality is relevant because, but for it, Mr. Drake presumably would not have remained in the hospital, leading to his subsequent arrest and the concomitant seizure of his items. *See Brown*, 2024 WL 1665328, at *5 ("We cannot simply bypass the legality of the pocket search because it appears to be a step in the causal chain that led to Brown's gun being discovered.").

We believe, and Mr. Drake does not appear to contest, that the initial stop of Mr. Drake when he exited the restroom was a proper investigatory detention supported by reasonable, articulable suspicion. A stop based on an officer's lookout description "is 'not an arrest, but rather a brief detention designed to give the undercover officer an opportunity to advise the arrest team if they had apprehended the perpetrators.'" *Carpenter v. United States*, 144 A.3d 1141, 1148 (D.C. 2016) (quoting *King v. United States*, 550 A.2d 348, 357 (D.C. 1988)). By the time of that stop, police officers had information that Mr. Drake matched the shooter's description (a Black male with long dreads wearing a camouflage jacket) and an officer had seen Mr. Drake walking out of an alley around the corner from Mirror Lounge within three minutes of the shooting.

We are not persuaded that this initial stop impermissibly morphed into an arrest.[4] *See Brown*, 2024 WL 1665328, at *4 ("To pass Fourth Amendment muster,

---

[4] In its oral ruling, the trial court did not explain why it viewed the initial detention of Mr. Drake as an investigatory stop rather than an arrest, and, as noted, the court has not entered a more comprehensive ruling. We nonetheless find it appropriate to decide the issue because (1) the parties' arguments were before the trial court, the government specifically argued at the suppression hearing that handcuffing and transporting Mr. Drake was appropriate, and the court expressly noted that it had considered all of the pleadings, including Mr. Drake's motion, which raised the conversion-to-arrest argument; (2) after having considered the parties' positions, the court characterized the initial detention as a "stop"; (3) the facts have been fully developed; (4) the question has been fully briefed on appeal; and (5) whether the detention was an investigatory stop or an arrest is an issue of

a *Terry* stop and frisk must be justified at its inception and also must remain within the scope of its justification."). In light of the violent nature of the suspected offense and the fact that officers had not yet secured the gun used in the shooting, the officers did not exceed the scope of a permissible investigatory stop by handcuffing Mr. Drake. *See, e.g.*, *id.* ("Officers may handcuff a suspect during a *Terry* stop if 'some specific fact or circumstance . . . support[s] a reasonable belief that the use of handcuffs [i]s necessary.'" (quoting *Katz*, 285 A.3d at 1303) (alterations in *Brown*)); *id.* (handcuffing during a *Terry* stop permissible when an individual is "suspected of a violent armed offense and there is reason to believe they are presently armed"); *Pridgen v. United States*, 134 A.3d 297, 301 (D.C. 2016) (stop-and-frisk "may entail the use of handcuffs to restrain the suspect"); *White v. United States*, 68 A.3d 271, 283 (D.C. 2013) (police may place suspect in handcuffs to ensure their safety during a *Terry* stop); *Hicks v. United States*, 730 A.2d 657, 660-61 (D.C. 1999) (police did not transform investigative detention of robbery suspect into arrest when they approached with guns drawn, frisked suspect, and handcuffed him); *Womack*, 673 A.2d at 609-10 ("[T]he use of handcuffs was justified where, as here, the crime of

---

law that this court reviews de novo. *Cf. Jackson*, 805 A.2d at 985 ("Whether a seizure has occurred for Fourth Amendment purposes is a question of law which this court reviews *de novo*, deferring to the trial court's factual findings, unless clearly erroneous.").

which the defendant was suspected was a violent one and the defendant was reported to have been armed.").

Nor did the brief attempt to escort Mr. Drake away from the emergency area of the hospital convert the investigatory stop into an arrest. *See In re M.E.B.*, 638 A.2d at 1127 (handcuffing and transporting the suspect for about five to ten minutes for identification procedures was reasonable and "did not convert the custody status of appellant from a 'detention for investigation' to a 'formal arrest'"); *see also In re I.J.*, 906 A.2d 249, 260 (D.C. 2006) ("Should the circumstances so dictate, a person may be seized—stopped, frisked, handcuffed, detained, transported in a police vehicle to another location (including a police station) and briefly questioned—so as to allow a *Terry* investigation on reasonable articulable suspicion without the encounter being deemed an arrest, within the meaning of the Fourth Amendment, requiring probable cause."); *Womack*, 673 A.2d at 606, 610 (handcuffing and taking suspect outside of his house to the porch did not convert an investigatory stop into an arrest).

After this initial investigatory stop, officers took Mr. Drake back to the emergency room for treatment of his injuries, and shortly thereafter officers seized the evidence at issue. By that time, the officers had heard that Officer O'Shea was "110 percent" sure that surveillance footage showed Mr. Drake at the scene of the

shooting and had learned that Mr. Drake had been shot in his foot. This information, combined with the information that officers already knew—that Mr. Drake matched the shooter's description and an officer had seen Mr. Drake walking out of an alley around the corner from Mirror Lounge within three minutes of the shooting—established probable cause to believe that Mr. Drake had committed an offense. Mr. Drake argues that this information was "at least equally indicative of a victim as it [was] a perpetrator." But probable cause does not require that officers' belief is "correct or more likely true than false." *Ball*, 803 A.2d at 974.

Once officers had probable cause to believe Mr. Drake had committed an offense, they were permitted to arrest him without a warrant. *See Collins v. Virginia*, 584 U.S. 586, 595 (2018) ("[I]t is a settled rule that warrantless arrests in public places are valid." (internal quotation marks omitted)). And once officers had probable cause to arrest Mr. Drake, they were permitted to search items incident to that arrest. *See Ford v. United States*, 245 A.3d 977, 986 (D.C. 2021) (probable cause to arrest justifies a search incident to arrest); *Ellison v. United States*, 238 A.3d 944, 950 (D.C. 2020) ("[A]side from an arrest supported by probable cause, 'a search incident to the arrest requires no additional justification.'" (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)). That is so even if the search of the evidence

came slightly before the arrest itself. *See United States v. Lewis*, 147 A.3d 236, 240-43 (D.C. 2016) (en banc); *Millet*, 977 A.2d at 935.[5]

Accordingly, we find no error in the trial court's denial of Mr. Drake's motion to suppress the evidence seized in the emergency room.

---

[5] "[P]olice may search incident to arrest only the space within an arrestee's "'immediate control,'" meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'" *Arizona v. Gant*, 556 U.S. 332, 335 (2009) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)) (internal quotation marks omitted). Mr. Drake does not argue that his belongings in the hospital room were not within his immediate control or, more generally, that police officers could not conduct a search incident to arrest if they had probable cause to arrest him, and so we do not reach the issue. We note, however, that body-worn camera footage introduced as an exhibit at the suppression hearing shows Mr. Drake's belongings piled on the hospital room floor near his gurney. We have held that police officers permissibly searched a suspect's jacket incident to arrest where the jacket was nearby but the suspect was in police control, the suspect was out of immediate range of the jacket, and the jacket was in the actual but not exclusive control of the officers. *Blackmon v. United States*, 835 A.2d 1070, 1075-76 (D.C. 2003). Similarly, we have held that police permissibly seized incident to arrest a hospital bag containing the suspect's clothing that was underneath the suspect's hospital gurney because the suspect was neither handcuffed nor within the secure grip of a police officer and could have "reach[ed] the bag with a lunge if he had wanted to do so." *Holt v. United States*, 675 A.2d 474, 481 (D.C. 1996). To be sure, *Blackmon* and *Holt* pre-date *Gant*, but they post-date *Chimel*, which established the rule that *Gant* applied in the context of vehicles.

## B. Admission of Evidence

Mr. Drake contends that the trial court erred in admitting the text message evidence indicating that had sought to purchase a gun about four months before the shooting. We are not persuaded.

### 1. Standard of Review

"We review a trial court's evidentiary decisions for abuse of discretion, and in doing so, broadly defer to the trial court due to its familiarity with the details of the case and its greater experience in evidentiary matters." *(Markus) Johnson v. United States*, 960 A.2d 281, 294 (D.C. 2008) (internal quotation marks omitted). "This deference particularly applies where the trial court must consider the relevance and potential prejudice of the evidence." *Young*, 305 A.3d at 434; *see (William) Johnson v. United States*, 683 A.2d 1087, 1095 (D.C. 1996) (en banc) ("[W]eighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision.").

### 2. Additional Background

Before trial, the government provided notice of its intent to introduce the September 2019 text messages and a photograph from Mr. Drake's cell phone in which the user of the phone made arrangements to acquire a handgun. The

government argued that the messages and photograph were evidence of uncharged criminal conduct but that they were admissible under *(William) Johnson*, 683 A.2d 1087, because "the firearm Mr. Drake arranged to purchase just four months before the shooting is consistent with the cartridge casings that were recovered from the scene of the shooting" and thus the evidence was "direct and substantial proof that [Mr. Drake] shot Ms. Lloyd with a 9mm firearm on January 23, 2020." Mr. Drake opposed admission of the evidence on the ground that it was neither direct and substantial proof of the charged crime, nor closely intertwined with the evidence of the charged crime, nor necessary to place the charged crime in an understandable context. *See (William) Johnson*, 683 A.2d at 1098. Specifically, Mr. Drake asserted that the messages did not show that he actually purchased the gun, were not temporally or causally connected to the shooting, did not add to the context of the crime, and were more prejudicial than probative.

The trial court noted that the text messages and photograph appeared to be "just evidence" rather than "other crimes" evidence because Mr. Drake was "simply having a conversation about the purchase of a gun." The court observed, however, that it could proceed by assuming that the evidence was *Johnson* "other crimes" evidence. The court ruled that the evidence was "direct and substantial proof of a crime that on this prior date about four months prior to the shooting, . . . there were text messages between Mr. Drake and an individual . . . discussing the purchase

of . . . a Taurus 9-millimeter semiautomatic firearm," noting that "on the scene, there were two 9-millimeter cartridge cases that were recovered." The court observed that Mr. Drake's argument that the messages did not show a completed purchase of a firearm went to the weight, not the admissibility, of the evidence. The court also stated that the evidence was probative and not overly prejudicial.

### 3. Discussion

Under *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964), evidence of "other crimes" is not admissible to prove general criminal propensity, but other-crimes evidence can be admitted for another "substantial, legitimate purpose." *Id*. at 89-90; *see Bellamy v. United States*, 296 A.3d 909, 916 (D.C. 2023), *cert. denied*, 144 S. Ct. 368 (2023); *Austin v. United States*, 292 A.3d 763, 776 (D.C. 2023) ("Evidence that a defendant has committed another crime is generally inadmissible 'unless that evidence can be admitted for some substantial, legitimate purpose.'" (quoting *Drew*, 331 F.2d at 90)). Such a purpose includes, but is not limited to, proof of (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan, and (5) identity. *Drew*, 331 F.2d at 90 & n.10; *see Bellamy*, 296 A.3d at 916. "[I]n order to be characterized as *Drew*-type evidence, the acts portrayed must be minimally in the nature of a criminal offense." *Wheeler v. United States*, 470 A.2d 761, 769 (D.C. 1983); *see In re Richardson*, 273 A.3d 342, 350-51 (D.C. 2022) (applying "*Drew*'s

strictures" to admission of voicemails the defendant had left "because they were 'minimally in the nature of a criminal offense' given that they were threatening"). For *Drew*-type evidence, the prosecution must "establish, by clear and convincing evidence, that the other crime occurred and that the defendant committed it." *(William) Johnson*, 683 A.2d at 1093.

In *(William) Johnson*, we explained that the *Drew* strictures "do[ ] not apply where [other-acts] evidence: (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." 683 A.2d at 1098; *see id.* at 1090 (*Drew* "does not apply to evidence of acts, including criminal conduct, that directly proves the crime charged"); *accord Haye v. United States*, 67 A.3d 1025, 1031-32 (D.C. 2013). Thus, evidence of uncharged acts is admissible "when relevant to explain the immediate circumstances surrounding the offense charged." *Toliver v. United States*, 468 A.2d 958, 960 (D.C. 1983). The central inquiry is whether the "evidence of incidental, uncharged criminal conduct is inextricably intertwined with evidence of the charged offense." *Id.* at 961. "Evidence of the contemporaneous criminal conduct is not 'other crimes' evidence." *Id.*

"Both *Drew* and *Johnson* evidence must 'be excluded if its probative value is substantially outweighed by . . . unfair prejudice.'" *Bellamy*, 296 A.3d at 917

(quoting *(William) Johnson*, 683 A.2d at 1099) (alteration in *Bellamy*). Thus, "if relevant evidence could theoretically support additional charges but is not subject to *Drew* analysis because the other crimes are not independent of the crime charged and the evidence is direct proof of the crime charged, it must surmount only the final hurdle that all evidence of whatever sort must clear, i.e., the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice it poses." *(William) Johnson*, 683 A.2d at 1101.

Accordingly, we consider, under abuse-of-discretion review, whether the text-message evidence was independent of or direct and substantial proof of the charged offenses, and, if the latter, whether any unfair prejudice to Mr. Drake from the evidence substantially outweighed its probative value.

We conclude that the trial court was within its discretion in determining that evidence of Mr. Drake's efforts four months before the shooting to purchase a gun of the same type used in the shooting was direct and substantial proof that Mr. Drake possessed and used a gun on the night of the shooting. Stated in the inverse, evidence about Mr. Drake's arrangements to buy a gun was certainly not *independent* of the charges that he had a gun of the same type on the night of the shooting. Accordingly, the government need not have provided a legitimate non-propensity purpose for the evidence nor have established by clear and convincing evidence that the act occurred

and that Mr. Drake committed it. Rather, the only "hurdle" for the evidence was that its probative value could not be substantially outweighed by the risk of unfair prejudice. *Id.* at 1101.

We likewise discern no abuse of discretion in the trial court's balancing of probative value against the risk of unfair prejudice. It is true that the messages do not establish that Mr. Drake in fact purchased a gun. While this in part goes to the weight of the evidence, not its admissibility, *see Stewart v. United States*, 881 A.2d 1100, 1111 (D.C. 2005) ("[T]he absence of a definitive link to the crime or the defendant merely affects the weight of the evidence, not its admissibility."), it does speak to the evidence's probative value. But the text messages showing Mr. Drake's specific efforts to obtain a gun were undoubtedly at least somewhat probative of his later possession and use of a similar gun. *Cf. (Carlos) Johnson v. United States*, 290 A.3d 500, 515 (D.C. 2023) (social media videos showing the defendant in physical possession of a similar gun as that involved in the offense "established 'only a reasonable probability, and not a certainty,'" that the defendant recently possessed the gun, "but that was sufficient; the linkage was not conjectural or remote, 'so the lack of certainty goes to the weight of the evidence, not its admissibility'" (quoting *Busey v. United States*, 747 A.2d 1153, 1165 (D.C. 2000) (emphasis omitted))); *Jones v. United States*, 127 A.3d 1173, 1186 (D.C. 2015) ("Given the likelihood that the gun previously seen in appellant's possession was of the same distinctive type

used in the charged offenses, it was less concerning that the prior sightings may have occurred several months, or even a year, before the charged offenses.").

Moreover, in the balancing test, to warrant exclusion, the probative value must be *substantially* outweighed by the danger of *unfair* prejudice. *See Ruffin v. United States*, 219 A.3d 997, 1010 (D.C. 2019). That is not the case here. The evidence "was not inflammatory evidence calculated to appeal to the jury's emotions and prejudice the jury against" Mr. Drake. *Id.* at 1011; *see Lewis v. United States*, 263 A.3d 1049, 1065 (D.C. 2021) ("'[U]nfair prejudice' means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (internal quotation marks omitted)).

Accordingly, we conclude that the trial court was within its discretion in admitting the text messages and photograph as direct and substantial proof of the charged offenses and determining that they were not substantially more unfairly prejudicial than probative.

### III.    Conclusion

For the foregoing reasons, we affirm the judgment of convictions.

*So ordered*.